**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

In re:                                     Case No. 09-23201-BKC-RAM

PHOENIX WORLDWIDE INDUSTRIES,              Chapter 11
INC.

      Debtor.
_____/

**CORRECTED[1] FIRST AMENDED DISCLOSURE STATEMENT**
**FOR DEBTOR IN POSSESSION'S PLAN OF REORGANIZATION**

    Dated: July 6, 2010

BAST AMRON LLP
*Counsel to the Debtor in Possession*
SunTrust International Center
One Southeast Third Avenue
Suite 1440
Miami, Florida 33131
Phone: (305) 379-7904
Fax: (305) 379-7905
Email: jbast@bastamron.com
Email: dquick@bastamron.com


By:   */s/ Jeffrey P. Bast*
    Jeffrey P. Bast, Esq. (FBN 996343)
    Dana R. Quick, Esq. (FBN 0074402)

---

[1] Corrected to reflect correct payment term for general unsecured creditors with claims of $1,001 or more in section IV.A.(5)(b). Additionally corrected on Exhibit D to provide the correct amount of creditor Anna Brown's claim.

## TABLE OF CONTENTS

I. Introduction  ......................................................................................... 4
    A. Generally ...................................................................... 4
    B. Voting Instructions ........................................................ 5
    C. Objections to the Plan  .................................................. 5

II. Summary of Chapter 11 ..................................................................... 6
    A. Property of the Estate ..................................................... 6
    B. Automatic Stay .............................................................. 7
    C. Plan of Reorganization .................................................. 7
    D. Disclosure Statement .................................................... 7
    E. Voting ........................................................................... 8
    F. Impairment .................................................................. 10
    G. Confirmation Standards  .............................................. 10

III. Definitions  .................................................................................... 11

IV. The Debtor  .................................................................................... 11
    A. History of the Debtor  .................................................. 11
    B. Events Leading to the Commencement of the Bankruptcy Case ............ 13
    C. Litigation .................................................................... 13

V. Debtor's Operations in Chapter 11 ................................................. 16
    A. First Day Motions  ...................................................... 16
    B. Developments During the Chapter 11 Case  .................. 18

VI. Summary of the Plan ..................................................................... 18
    A. Classification and Treatment of Claims and Interests  ............ 18
    B. Claimants and Impaired Interest Holders .................... 21
    C. Legal Proceedings  ...................................................... 21
    D. Debtor's Post-Confirmation Structure  ........................ 24
    E. Means for Implementing the Plan  ................................ 25
    F. U.S. Trustee Fees ........................................................ 26
    G. Executory Contracts and Unexpired Leases  ................ 26

VII. Alternatives to Plan and Liquidation Analysis  ........................... 27
    A. Dismissal .................................................................... 27
    B. Chapter 7 Liquidation ................................................. 27

VIII. Risk Analysis .............................................................................. 28

IX. Certain U.S. Federal Income Tax Consequences of the Plan ................ 29
    A. U.S. Federal Income Tax Consequences to the Debtor  ........... 30
    B. U.S. Federal Income Tax Consequences to an Investor Typical of
       the Holders of Claims and Interests  ........................ 31

    C.  Importance of Obtaining Professional Tax Assistance ........................... 32
    D.  Circular 230 Disclaimer .................................................................. 33

**X. Acceptance and Confirmation of Plan** ........................................................ **33**

**XI. Release Provisions** ................................................................................... **36**
    A. Injunction ...................................................................................... 36
    B. Terms of Injunctions or Stays ............................................................ 36

**XII. Miscellaneous Provisions** ....................................................................... **36**

**XIII. Effect of Confirmation of the Plan** ......................................................... **37**
    A. Discharge ...................................................................................... 37
    B. Re-vesting of Property in the Debtor .................................................... 37
    C. Final Decree .................................................................................. 37

**XIV. Conclusion** ........................................................................................... **38**

**Exhibits:**
    Plan of Reorganization ................................................................. Exhibit A
    Liquidation Analysis ................................................................... Exhibit B
    Schedule of Plan Payments ........................................................... Exhibit C1
    Financial Projections .................................................................. Exhibit C2
    Summary of Claims ..................................................................... Exhibit D
    List of Litigation ....................................................................... Exhibit E
    List of Shareholders ................................................................... Exhibit F
    Verified translation of supply contract with Esenerji Sanayi .......... Exhibit G

# I. INTRODUCTION

## A.      Generally.

The Debtor, PHOENIX WORLDWIDE INDUSTRIES, INC., has proposed a Plan of Reorganization (the "Plan") under Chapter 11 of the United States Bankruptcy Code. A copy of the Plan is attached hereto as Exhibit A. Creditors have the opportunity to vote to accept or reject the Plan. The Plan is summarized in this Disclosure Statement (the "Disclosure Statement"). The Plan provides the means for distributing the funds collected by the Debtors and the Plan Trustee, as the case may be, to creditors.  The purpose of this Disclosure Statement is to provide information deemed to be material, important and necessary to enable Creditors to arrive at a reasonably informed decision.

**THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT CONCERNING THE FINANCIAL CONDITION OF THE DEBTORS' BANKRUPTCY ESTATES IS BASED UPON FINANCIAL, AND OTHER, INFORMATION DEVELOPED BY DEBTORS' MANAGEMENT AND ITS PROFESSIONALS FROM THE DEBTORS' RECORDS. THE INFORMATION IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECT TO AN AUDIT AND THEREFORE MAY BE SUBJECT TO ERROR. SOME FINANCIAL INFORMATION MAY HAVE BEEN OVERLOOKED INADVERTENTLY IN THE PREPARATION OF THIS DISCLOSURE STATEMENT, BUT IT IS BELIEVED THAT THE DISCLOSURE STATEMENT IS GENERALLY ACCURATE.**

**THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT AS CONTAINING "ADEQUATE INFORMATION" FOR HOLDERS OF CLAIMS AND INTERESTS TO MAKE AN INFORMED DECISION, IN ACCORDANCE WITH § 1125(b) OF THE BANKRUPTCY CODE, REGARDING WHETHER TO ACCEPT OR REJECT THE DEBTORS' PROPOSED CHAPTER 11 PLAN. APPROVAL OF THIS DISCLOSURE STATEMENT BY THE COURT DOES NOT INDICATE THAT THE COURT RECOMMENDS EITHER ACCEPTANCE OR REJECTION OF THE PLAN.**

**YOU SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN. THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN TERMS OF THE PLAN, BUT THE PLAN ITSELF WILL BE THE GOVERNING DOCUMENT. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.**

Under the Bankruptcy Code, only classes of Claims or Interests that are "impaired" under the Plan may vote to accept or reject the Plan. The Plan sets forth which Classes the Debtors believe are impaired Classes entitled to vote on the Plan. **ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO MEMBERS OF SUCH VOTING CLASSES.**

After carefully reviewing the Plan, including all its attachments and this Disclosure Statement and its exhibits, please indicate your vote by accepting or rejecting the Plan on the enclosed Ballot and return it in the envelope provided. See Subsection B: "Voting Instructions." Please read the balloting package instructions carefully and vote every ballot you receive.

For a summary description of the treatment of each Class of Claims and Interests and the estimated value of distributions to each Class of Claims and Interests, see Section VI.

The Court has scheduled a hearing to consider confirmation of the Plan for _____, 2010, at _____, ____.m. in the United States Bankruptcy Court, Claude Pepper Federal Building, 51 SW First Avenue, Miami, Florida 33130 (the "Confirmation Hearing"). The Court has directed that objections, if any, to confirmation of the Plan be filed with the Court and served so as to actually be received by various parties on or before _____, 2010 at 4:00 p.m. The date of the Confirmation Hearing may be adjourned from time to time without further notice.

**B.      Voting Instructions.**

**(1)      Ballots**

In voting for or against the Plan, please use only the ballot sent to you with this Disclosure Statement. **IF YOU RECEIVE MORE THAN ONE BALLOT, YOU SHOULD ASSUME THAT EACH BALLOT IS FOR A SEPARATE CLAIM AND YOU SHOULD COMPLETE AND RETURN ALL OF THEM.**

**(2)      Returning Ballots**

**IN ORDER TO BE COUNTED, BALLOTS MUST ACTUALLY BE RECEIVED BY THE BALLOTING AGENT IDENTIFIED ON THE BALLOT ON OR BEFORE_____ _____, 2010 AT 4:00 P.M., YOUR BALLOT MAY NOT BE COUNTED IF IT IS RECEIVED LATER.**

**C.      Objections to the Plan.**

The Bankruptcy Court has established _____, 2010 as the latest date on which all objections to the confirmation of the Plan must be **actually received** at the following address: Clerk of the Court, United States Bankruptcy Court, Claude Pepper Federal Building, 51 SW First Avenue, Miami, Florida 33130 and served upon the Debtor at _____ with copies to Jeffrey Bast at One Southeast third Avenue, Suite 1440, Miami, FL 33131.

| **The Objection Deadline is _____, 2010 at 5:00 p.m.**<br><br>**(Prevailing Eastern Time)** |
| --- |

Section 1128 of the Bankruptcy Code requires a bankruptcy court to hold a hearing on the confirmation of a plan of reorganization under chapter 11. Section 1128 of the Bankruptcy Code also provides that any party in interest may object to confirmation of the plan.

**The Confirmation Hearing will be held on _____, 2010 at __:____ __.m.**

**before the Honorable Robert A. Mark, United States Bankruptcy Judge,**

**in the United States Bankruptcy Court for the Southern District of Florida,**

**Miami Division, United States Bankruptcy Court,**

**Claude Pepper Federal Building, 51 SW First Avenue, Miami, Florida 33130.**

**(Prevailing Eastern Time)**

As a creditor, your vote is important. In order for the Plan to be deemed accepted, of the ballots cast, creditors that hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the allowed claims of impaired Classes must accept the Plan. However, you are advised that the Debtors may be afforded the right under the Bankruptcy Code to have the Plan confirmed over the objections of dissenting creditors consistent with the limitations set forth in the Bankruptcy Code.

NO REPRESENTATIONS CONCERNING THE DEBTORS ARE AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE WHICH ARE OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTORS, WHO IN TURN SHALL DELIVER SUCH INFORMATION TO THE UNITED STATES TRUSTEE FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE.

You are urged to carefully read the contents of this Disclosure Statement before making your decision to accept or reject the Plan. Particular attention should be directed to the provisions of the Plan affecting or impairing your rights as they presently exist. The terms used herein have the same meaning as in the Plan unless the context hereof requires otherwise.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED BY THE DEBTORS' MANAGEMENT, UNLESS SPECIFICALLY STATED TO BE FROM OTHER SOURCES. NO REPRESENTATIONS, OTHER THAN THOSE SET FORTH HEREIN, CONCERNING THE DEBTORS, ARE AUTHORIZED BY THE DEBTORS.

## II. SUMMARY OF CHAPTER 11

### A.    Property of the Estate.

The commencement of a chapter 11 bankruptcy case creates an estate comprising all the legal and equitable interests of the debtor in property as of the date the petition is filed.  Sections

1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" unless the bankruptcy court orders the appointment of a trustee. No trustee has been appointed.

**B.       Automatic Stay.**

Pursuant to Bankruptcy Code § 362, the filing of a chapter 11 petition operates as an automatic stay applicable to all entities of various actions, including actions to collect pre-petition claims from the Debtor or otherwise interfere with its property or business.

**C.       Plan of Reorganization.**

The chapter 11 plan of reorganization sets forth the terms of the Debtor's financial reorganization. Since no trustee has been appointed, only the debtor may file a plan during the first 120 days of a Chapter 11 case. Section 1121(d) of the Bankruptcy Code permits the court to extend or reduce that 120-day period and the Court did in its initial order giving the Debtor 150 days to file its Plan. After the "exclusivity period" has expired, a creditor or any other party-in-interest may file a plan, unless the debtor files a plan within the exclusive period. If a debtor files a plan within the exclusivity period, then the debtor is given 60 additional days during which the debtor may solicit acceptances of its plan. The solicitation period may be extended or reduced by the court upon a showing of "cause."

In this case, the Debtor filed its Motion to Extend Exclusivity Period in Which Debtor May File a Plan of Reorganization (DE #108), upon which the Court entered an order extending exclusivity to January 2, 2010 (DE #129). The Debtor subsequently filed its Second Motion to Extend Exclusivity Period in Which the Debtor May File a Plan of Reorganization (DE #172), upon which the Court entered an order further extending the Debtor's exclusivity period to March 26, 2010 (DE #179). Concurrent with the Debtor's filing of its Plan of Reorganization on March 26, 2010, the Debtor sought a further extension of its exclusivity period, to allow additional time for confirmation of the plan, pursuant to 11 U.S.C. § 1121(c)(3) (DE #195); upon which the Court granted an additional 60 days to confirm the plan, through and including August 31, 2010 (DE #224).

**D.       Disclosure Statement.**

An acceptance or rejection of a plan may not be solicited after the commencement of a chapter 11 case from the holders of a Claim or Equity Interest unless, at the time of or before such solicitation, there is transmitted to such holder the plan and a written disclosure statement approved, after notice and a hearing, by the court confirming "adequate information." "Adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical, reasonable investor typical of holders of claims or interest of the relevant class to make an informed judgment about the plan.

**E.    Voting.**

**(1)    Who May Vote or Object**

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan.  A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

*(a)    What Is an Allowed Claim or an Allowed Equity Interest?*

Only a creditor or equity interest holder with an allowed claim or an allowed equity interest has the right to vote on the Plan.  Generally, a claim or equity interest is allowed if either (1) the Debtor has scheduled the claim on the Debtors schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest. When a claim or equity interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

***The deadline for filing a proof of claim in this case has expired.  The deadline for non-governmental entities to file a proof of claim was October 28, 2009, and for governmental entities it was December 28, 2009.***

**(2)    What Is an Impaired Claim or Impaired Equity Interest?**

As noted above, the holder of an allowed claim or equity interest has the right to vote only if it is in a class that is impaired under the Plan.  As provided in § 1124 of the Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

In this case, the Plan Proponent believes that Classes: 2(a)-(f), 3, and 5 are impaired and that holders of claims in each of these classes are therefore entitled to vote to accept or reject the Plan.  The Plan Proponent believes that Classes 1, 2(g), 4, and 6, respectively, are unimpaired and that the holders of claims in this class, therefore, do not have the right to vote to accept or reject the Plan.

**(3)    Who is NOT Entitled to Vote**

The holders of the following types of claims and equity interests are not entitled to vote to accept or reject the Plan:

- holders of claims and equity interests that have been disallowed by an order of the Court;

- holders of other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes.

- holders of claims or equity interests in unimpaired classes;

- holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code;

- holders of claims or equity interests in classes that do not receive or retain any value under the Plan; and

- administrative expenses.

***Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan and to the Adequacy of the Disclosure Statement.***

**(4)    Who Can Vote in More Than One Class**

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim.

**(5)    Votes Necessary to Confirm the Plan**

If impaired classes exist, the Court cannot confirm the Plan unless: (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by a cram down on non-accepting classes.

**(*a*)    *Votes Necessary for a Class to Accept the Plan***

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan.

**(*b*)    *Treatment of Nonaccepting Classes***

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner prescribed by § 1129(b) of the

Code.  A plan that binds nonaccepting classes is commonly referred to as a cramdown plan.  The Code allows the Plan to bind nonaccepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of § 1129(a)(8) of the Code, does not discriminate unfairly, and is fair and equitable toward each impaired class that has not voted to accept the Plan.

***You should consult your own attorney if a cramdown confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.***

## F.    Impairment.

A class of Claims or Interests is "impaired" if the legal, equitable, or contractual rights attaching to the Claims or Interests of that class are modified.  Modification for purpose of determining impairment, however, does not include curing defaults and reinstating maturity.

## G.    Confirmation Standards.

### (1)    General

The proponent of the plan of reorganization must meet all applicable requirements of § 1129(a) of the Bankruptcy Code (except § 1129(a)(8) if the proponent proposes to seek confirmation of the plan under the provisions of § 1129(b) of the Bankruptcy Code).  These requirements include, among other things, that:  (a) the plan comply with applicable provisions of Title 11, United States Code and other applicable law;  (b) the plan be proposed in good faith; (c) at least one impaired Class of claims must accept the plan, without counting votes of insiders; (d) the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and (e) the Plan must be feasible. These requirements are <u>not</u> the only requirements listed in § 1129, and they are not the only requirements for confirmation.

### (2)    Cramdown

The Bankruptcy Court may confirm a plan of reorganization even though fewer than all the classes of impaired Claims and Interests have accepted the plan.  If a plan of reorganization is to be confirmed despite the rejection of a class of impaired Claims or Interest, then the proponent of the plan must show, among other things, that the plan of reorganization does not discriminate unfairly and that the plan is fair and equitable with respect to each impaired class of Claims or Interest that has not accepted the plan of reorganization.  See discussion below.

(3)    **Liquidation Analysis**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation.  A liquidation analysis is attached to this Disclosure Statement as Exhibit B.

(4)    **Feasibility**

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

(a)    *Ability to Initially Fund Plan*

The Debtor believes that the Debtor will have enough cash on hand on the effective date of the Plan to pay all the claims and expenses that are entitled to be paid on that date.

(b)    *Ability to Make Future Plan Payments And Operate Without Further Reorganization*

The plan proponent must also show that it will have enough cash over the life of the Plan to make the required Plan payments. A schedule of the projected plan payments is attached as Exhibit C1.

The Debtor has provided projected financial information.  Those projections are detailed in Exhibit C2, and described more fully in Section VI. E. below.

*You Should Consult with Your Accountant or other Financial Advisor If You Have Any Questions Pertaining to These Projections*.

## III. DEFINITIONS

The terms used herein have the same meaning as in the Plan unless the context hereof requires otherwise.

## IV. THE DEBTOR

### A.    History of the Debtor.

The Debtor is a Florida corporation, formed in 1982, with offices located at 10780 S.W. 190th Street, Miami, Florida 33157. The Debtor is a defense contractor in the business of designing and manufacturing passive, covert, stealth surveillance gathering, tagging, tracking

and intercepting equipment. The Debtor's primary customer base is comprised of domestic intelligence agencies as well as foreign governments. Phoenix also sells its products to airlines, transportation services and school systems.

Prior to forming the corporation, its president, Dr. Al Esquivel Shuler, served for several years as an officer in the United States Navy, where he conducted special operations. After retiring on medical disability, he obtained a Ph.D. in Nuclear Physics & Nuclear Engineering from Purdue University. He has previously served as Vice President of Financial Engineering for Eastern Airlines, Inc., and as Vice President of Manufacturing for Fairchild Industries, Inc., in Brussels, Belgium.

Phoenix has produced and deployed, throughout the world, a wide range of specialty products that are custom developed to meet the specific law enforcement, investigative, intelligence, security, and operating needs of government, military and private security organizations. The Debtor develops and manufactures the following products and systems,[2] among others:

- Acoustic and RFI Shielded Clean Room Enclosures for installation in clients' facilities that prevents any type of external or internal electromagnetic eavesdropping and recording of conversations and data;

- "Intelligent Video" – an integrated hardware and software platform to provide real time, alert-driven, threat detection without human intervention as well as control of video streaming, available in wired or wireless communication options, featuring integrated mapping, a camera/sensor placement tool, local network video recording, and automated video/data archiving;

- Stealth-Covert Intercept and Tracking Systems, Command & Control Platforms from C21 to C6I, Special Operations Platforms, Tactical Platforms, Mobile Intelligence Platforms, Mobile Jamming Platforms, Mobile Perimeter/Border Protection, Mobile Laboratories and ECM, ECCM and ESM Shelters for HMMVW and other vehicles;

- Vehicle, Trailer and Shipping Container Satellite Tracking & Security over the horizon unattended Sensors that provide Unite I.D., latitude, longitude, Zulu time, alarm status and geo-fencing information;

- Dignitary Vehicle Caravan Protection and Escort Platforms;

---

[2] Some of the specialty systems are "defense articles" classified under the category of "Military Electronics" under the United States Munitions List contained in the International Traffic in Arms Regulations ("ITAR"). 22 C.F.R. § 121.1. ITAR is a set of United States government regulations that control the export and import of defense-related articles and services on the United States Munitions List. These regulations implement provisions of the Arms Export Control Act. Prior to exporting any of its specialty systems to a foreign governmental agency, Phoenix must apply for an export license issued by the United States Department of State and obtain approval of the exportation of its products under said license.

- Multi-Platform Network Sensor Software Suites as well as Satellite Tracking Software for its Satellite GPS Tracking Systems.

On August 24, 1992, Hurricane Andrew destroyed the Debtor's industrial facilities. The Debtor's facilities and equipment suffered over eleven million dollars worth of damage. Lengthy litigation with the insurance company ensued, which was only minimally successful. In 2001, to raise money, the Debtor issued a Private Placement Memo ("PPM") to friends and family. The PPM raised $7 million dollars.

The Debtor continues to operate its business as a debtor in possession. The Debtor currently has 12 employees.

## B.    Events Leading to the Commencement of the Bankruptcy Case.

The main impetus for the Debtor's commencement of the bankruptcy case was the seizure of its assets by Creditor C3 Capital Partners and C3 Capital Partners II, L.P. (collectively "C3 Capital"), which described in greater detail below in subsection C.(5). Additionally, there are several financial and political factors that contributed to the Debtor's petition for relief, which are described below.

After September 11, 2001, and especially after the military invasion of Iraq in 2003, the Debtor's business slowed due to an increased demand for destructive weaponry, such as explosives and traditional arms. The Debtor does not design or manufacture the chemicals and weapons that the military and intelligence agencies sought – the Debtor exclusively designs and manufactures surveillance and passive tagging technology.

During the last few years, the Debtor has also been a party to several lawsuits, which have further depleted its resources. These lawsuits are described in greater detail in Subsection C.

The Debtor experienced another slow-down in demand for its products due to the presidential election in 2008. Every four years, defense contractors experience a slow-down in demand for their products as the market waits to see what policy changes will take place after the presidential election.

Finally, the worldwide financial crisis dealt another harsh blow to the Debtor, as demand for its products has declined even more.

## C.    Litigation.

### (1)    *Phoenix Worldwide Industries, Inc. v. ARC Logistics Miami Int'l, Inc., et at* **(Case No. 2009-5339-CA-OI, Eleventh Judicial Circuit for Miami-Dade County, Florida).**

This lawsuit arises out of various agreements relating to the sale of highly specialized spy vehicles and other intelligence equipment manufactured by the Debtor for the Departamento Administrativo de Seguridad ("DAS"), the secret service agency of Colombia. At the request of DAS, a Colombian entity called Colvista, Ltda. ("Colvista") contracted with the Debtor to serve

as the Debtor's and DAS' agent in order to assist as an intermediary representative as required under Columbian law to DAS. The Debtor delivered two of the intelligence-surveillance vehicles to Colvista, but DAS and Colvista breached their contractual obligations to the Debtor, by, among other things, failing to pay all amounts owed for the goods. The Debtor demanded the return of two of the intelligence-surveillance vehicles.

Colvista ignored the Debtor's requests and instead provided the vehicles to ARC Logistics Miami International, Inc. ("ARC"), formerly a logistics company in Miami, Florida, in an apparent attempt to illegally smuggle them to Colombia. The Debtor was charged unreasonable storage fees by ARC while the vehicles remained in its possession. The Debtor sued ARC in order to regain possession of the vehicles and for other claims as a result of the excessive fees it was charged for the storage fees.

Colvista later intervened in the case, first by seeking an injunction for the return of the intelligence-surveillance vehicles, and later by filing a counterclaim against the Debtor. Colvista's request for injunctive relief was later withdrawn. The counterclaim mainly alleges that Colvista is owed money in connection with the sale between the Debtor and DAS. The Debtor has filed a motion to dismiss Colvista's counterclaim for failure to state a cause of action. The Court has not ruled on the Debtor's motion to dismiss.

The Debtor believes it has valid claims against Colvista based on its attempt to illegally smuggle the vehicles out of the country and its multiple breaches of various agreements between the parties, and against DAS for failure to pay for the two remaining vehicles, delays, change orders, and the remaining balance of the contract. The Debtor intends to pursue this litigation before the Bankruptcy Court.

The failure of DAS and Colvista to pay for the services rendered in the last quarter of 2008, and for the balance owed for the two vehicles and equipment have also contributed to Phoenix's failure to pay its debts as they become due.

**(2)    *Maxus Capital Group, LLC v. Phoenix Worldwide Industries, Inc.* (Case No. 2009-31384-CA-I0, Eleventh Judicial Circuit for Miami-Dade County, Florida).**

This lawsuit arises out of a lease agreement between the Debtor and Maxus Capital Group, LLC ("Maxus"). Pursuant to the lease agreement, the Debtor leased certain equipment from Maxus for use in connection with the operation of its business. Maxus commenced the above-captioned lawsuit against the Debtor and its president[3] for failure to pay sums due under the lease. The complaint filed by Maxus raises claims for breach of lease agreement, breach of guaranty and replevin of the leased equipment.

After an Order to Show Cause hearing, the Court issued a writ of replevin for the return of the leased equipment on or about June 9, 2009. Neither the Debtor nor its president responded to the complaint filed by Maxus in this lawsuit.

---

[3] The Debtor's president personally guaranteed all sums due under the lease.

(3)    ***Maxus Capital Group, LLC v. Phoenix Worldwide Industries, Inc.*** **(Case No. 2009-15533-CA-IO, Eleventh Judicial Circuit for Miami-Dade County, Florida).**

In this lawsuit, Maxus raises the same claims based on the same operative facts as alleged in Case No.: 2009-31384-CA-10. Again, the Debtor and its president were both named as defendants. In this case, both the Debtor and its president filed an answer and affirmative defenses to the complaint. On June 1, 2009, Maxus filed a motion for summary judgment. No response has been filed yet as the instant bankruptcy stayed the litigation.

(4)    ***C3 Capital Partners (LP), et al v. Phoenix Worldwide Industries, Inc., et al*** **(Case No. 2009-39415-CA-OI, Eleventh Judicial Circuit for Miami-Dade County, Florida).**

C3 Capital lent funds to the Debtor comprising a bridge loan secured by promissory notes and a security agreement. The principal amount of the loan was $500,000. The security agreement provides for a blanket lien on the Debtor's assets as collateral for the loan.

Upon the Debtor's alleged default under the promissory notes and security agreement, C3 Capital's Missouri counsel notified the Debtor of its alleged default. Soon thereafter, C3 Capital commenced a lawsuit against Phoenix in the Circuit Court of Jackson County, Missouri (Case No.: 0916-CV 04354). The Circuit Court in Jackson County, Missouri ultimately rendered a default judgment against the Debtor due to its failure to respond to the complaint, however, the Debtor's counsel was never provided with notice of the Missouri lawsuit until the default was entered. C3 Capital initiated the above referenced action in Florida to domesticate the Missouri default judgment.

(5)    ***C3 Capital Partners (LP), et al v. Phoenix Worldwide Industries, Inc., et al*** **(Case No. 2009-40275-CA-OI, Eleventh Judicial Circuit for Miami-Dade County, Florida).**

In addition to domesticating the Missouri default judgment, C3 Capital filed this action seeking to replevy the Debtor's property pursuant to the blanket lien contained in the security agreement. On June 17, 2009, C3 Capital, through an officer of the Sheriff's office, served a prejudgment writ of replevin on the Debtor and began seizing the Debtor's property from its facility. While the Sheriff was proceeding to replevy the Debtor's property, as well as the personal belongings of its representatives, the Debtor filed an emergency motion to stay or quash the prejudgment writ. The emergency motion asserted primarily that C3 Capital failed to properly serve the Debtor or show cause for the issuance of the prejudgment writ.

The Court, after conducting a brief telephonic hearing, temporarily stayed execution of the prejudgment writ pending the resolution of the emergency motion. An evidentiary hearing was later held to determine if Phoenix was served properly. The Court ruled in favor of C3 Capital and held that the prejudgment writ was property issued, and that it could be executed.

(6) ***Zions First National Bank v. Phoenix Worldwide Industries, Inc., et al*** (Case No. 2009-23685-CA-02, Eleventh Judicial Circuit for Miami-Dade County, Florida).

Zions First National Bank ("Zions Bank") lent funds to the Debtor for the principal sum of $2,500,000, secured by: (1) a promissory note; (2) a mortgage encumbering the Debtor's facility; (3) an assignment of rents, (4) a security agreement, and (5) a personal guaranty. The principal balance of the loan is currently $2,462,241.98.

Upon the Debtor's alleged default under the promissory notes, security agreement, mortgage and personal guarantee, Zions Bank commenced the above-referenced lawsuit against the Debtor and its president. The complaint seeks to foreclose on the Debtor's facility and obtain damages under the promissory note and personal guaranty. Additionally, the complaint seeks an assignment of all rents generated by the facility and appointment of a receiver to manage the facility.

Zions Bank filed a motion for default on June 22, 2009, but no default has yet been entered. The action has been stayed by this bankruptcy proceeding.


## V. DEBTOR'S OPERATIONS IN CHAPTER 11

On June 29, 2009 (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court"). The Debtor has continued to operate its business as a Debtor-in-Possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

## A.      First Day Motions.

On the Petition Date, the Debtor filed a series of motions and applications with the Bankruptcy Court seeking relief designed to minimize disruption of its business operations and to facilitate the chapter 11 process (collectively, the "First Day Motions").

Following the hearings held on July 6, 2009, and based upon the Declaration in Support of First Day Pleadings (DE #17) by the Debtor's President, the Bankruptcy Court entered several orders that, as a group, were designed to permit the Debtor to operate their business during the Chapter 11 case with as little disruption as possible. A brief summary of each of the First Day Orders are provided below.

To facilitate a smooth and efficient administration of the Debtors' chapter 11 cases, on July 7, 2009, the Bankruptcy Court entered an order authorizing the Debtor to utilize an existing bank account and cash management system (DE #30), with certain conditions. The Order also permitted the Debtor to continue using its then-current business forms.

The Bankruptcy Court also entered an order on July 7, 2009, authorizing the Debtor to retain Jeffrey P. Bast and BAST AMRON LLP as the Debtor's bankruptcy counsel an interim basis

(DE #29). On September 18, 2009, the Bankruptcy Court entered a final order authorizing the Debtor to retain Jeffrey P. Bast and BAST AMRON LLP (DE #89).

Also on July 7, 2009, the Court entered an order allowing the Debtor to use cash collateral on an interim basis (DE #31). The interim order provided that the Debtor was permitted to use cash collateral to pay its ordinary business expenses provided the Debtor did not exceed the line items budgeted by more than 10%; that the Debtor was authorized to grant C3 Capital post-petition liens and replacement security liens, subject to and subordinate in priority to other liens, security interests, and encumbrances existing as of the Petition Date. On August 11, 2009, the Court entered a second order authorizing the Debtor to use cash collateral on an interim basis (DE #71),[4] continuing the same relief granted in the first interim order. On October 9, 2009, the Court entered an agreed order denying without prejudice the Debtor's motion for use of cash collateral (DE #99), providing that should the Debtor receive additional cash collateral, it could re-file its motion.

On July 22, 2009, secured creditor Maxus Capital SPE I, LLC ("Maxus SPE") filed a motion to compel the Debtor to assume or reject an equipment lease (DE #45). Subsequently, on September 1, 2009, the Court entered an agreed order in which the Debtor agreed to resume making regular monthly lease payments of $34,940 (DE #82). Pursuant to the order, when the Debtor was unable to make the required monthly payments, it filed a motion to reject the Maxus SPE lease (DE #141). However the Debtor and Maxus SPE were able to reach an agreement whereby the lease payment due December 2009 was abated until the Debtor confirmed a plan of reorganization (DE #176).

On November 13, 2009, Maxus Capital Group, LLC ("Maxus Capital"), filed a motion for relief from stay (DE #127), upon which the Court entered an agreed order granting stay relief (DE #146), which provided the Debtor was to make adequate protection payments of $18,000 per month.

On August 26, 2009, Zions Bank filed a motion seeking alternatively relief from the automatic stay or payment of adequate protection (DE #76). On October 6, 2009, the Court entered a consent order on the Motion requiring the Debtor to make adequate protection payments of $24,000 per month (DE #97).

On November 3, 2009, the Debtor filed its second motion for authorization to use cash collateral (DE #117). The Court granted the motion (DE #123). The order provided for further use of cash collateral including payment of adequate protection to C3 Capital in the amount of $18,000 per month; $30,000 to Zions Bank; and $34,940 to Maxus SPE. Subsequently, on December 4, 2009, the Debtor filed its third motion for authorization to use cash collateral (DE #137). The Court has granted the third motion by three orders allowing continued use of cash pursuant to budgets which include additional monthly payments to C3, Zions, Maxus Capital, and Maxus SPE (DE #163, 178, and 186).

From November 2009 through May 2010, the Debtor generated approximately $1.6 million in revenue primarily from two ongoing contracts. The first is a contract with the U.S.

---

[4] A corrected order was entered on September 9, 2009 (DE #84), which was corrected to include the budget as an attachment.

Army called Army TARDEC.  Under this contract the Debtor developed, integrated, tested, and provided training for the use of intelligent surveillance vehicles.  The second was a contract with the United States Drug Enforcement Agency to outfit two vehicles with the Debtor's surveillance and intelligent video equipment.  The Debtor understood from the DEA that if the initial vehicles were successful for the DEA, additional orders would follow.  Additionally, the Debtor fulfilled other smaller contracts which generated revenue, including contracts with the city of Hialeah Police Department and Tahsin Bayrakter Electronics Solutions.

The Debtor has been and continues to be current on these secured creditor payments. Including payments to C3, Zions, Maxus Capital, and Maxus SPE, the Debtor has paid over $555,000 to these secured creditors during the pendency of this case.

## B.    Developments During the Chapter 11 Case.

### (1)    Debtor's Schedules of Liabilities and Assets and Statement Financial Affairs

On July 22, 2009, the Debtor filed its schedules of assets and liabilities and statement of financial affairs (collectively, the "Schedules and SOFA") (DE #48).  The Schedules and SOFA provide information concerning the Debtor's assets, liabilities (including accounts payable), executory contracts, and other financial information as of the Petition Date, all as required by § 521 of the Bankruptcy Code, and Rule 1007 of the Federal Rules of Bankruptcy Procedure.

### (2)    Establishment of Bar Date

On July 2, 2009, the Court established October 28, 2009 (the "Bar Date"), as the deadline for each person or entity asserting a claim against the Debtor to file a written proof of claim (DE #10) (the "Bar Date Order").  The Bar Date Order also established December 28, 2009, as the deadline for all governmental units to file a written proof of claim against the Debtor.

### (3)    Claims Filed Against the Debtors

As of March 26, 2010, a total of 51 claims have been filed against the Debtor, totaling approximately $9.3 million in asserted liabilities.  These claims are comprised of approximately $2.8 million in secured claims, $1.3 million in priority claims, and $5.2 million in unsecured claims.  A summary schedule of all filed and scheduled claims is attached as Exhibit D.

## VI. SUMMARY OF THE PLAN

## A.    Classification and Treatment of Claims and Interests.

### (1)    Unclassified Claims

#### (a)    *Administrative expenses*

All administrative expenses shall be paid on the Effective Date of the Plan. These expenses are currently estimated to be $85,000.

### (b)    U.S. Trustee Fees

All outstanding U.S. Trustee fees shall be paid on the Effective Date of the Plan. These expenses are estimated to be $4,500.

## (2)    Priority Claims

### (a)    Tax claims of $1,000 or less

All tax claims due and owing of $1,000 or less shall be paid in full on the Effective Date of the Plan. These claims total $897.21.

### (b)    Tax claims of $1,001 or more

All tax claims due and owing of $1,001 or more shall be paid in equal monthly installments over not longer than 5 years (or 60 months) from the Petition Date, and shall be paid a rate of interest of 5 per cent. These claims total $674,806.27.

### (c)    Priority wage claims

All priority wage claims of up to $10,950 shall be paid upon the Effective Date of the Plan. These claims are estimated to total $198,221.33. However, the Debtor intends to object to a number of these claims as they represent wages earned outside of the priority period; therefore, this amount may be less.

### (d)    Other priority claims

There was one claim filed, which seeks priority as a domestic support obligation, see claim #16 of JDL Industries, Inc. The Debtor intends to object to this claim on the basis that it should be classified as general unsecured claim. This claim totals $654.26.

## (3)    Secured Claims

### (a)    Miami-Dade County Building Department

The Debtor intends to object to this claim; however, upon allowance by the court, the claim will be paid in full in equal monthly installments over a five year period with interest accruing at 5% per annum, beginning as of the Effective Date of the Plan. This claimant will maintain its lien until this obligation is paid in full.

### (b)    Zions First National Bank

This claim will be paid in full in equal monthly installments over the remainder of its 25 year loan term, with interest accruing at 5% per annum, beginning as of the Effective Date of the Plan. This claimant will maintain its lien until this obligation is paid in full.

### (c)    Maxus Capital Group, LLC

This claim will be paid in full in equal monthly installments over a five year period with

interest accruing at 5% per annum, beginning as of the Effective Date of the Plan. This claimant will maintain its lien until this obligation is paid in full.

### (d)    *C3 Capital Partners*

This claim will be paid in full in equal monthly installments over a five year period with interest accruing at 5% per annum, beginning as of the Effective Date of the Plan. This claimant will maintain its lien until this obligation is paid in full.

### (e)    *PPTS 1, LLC*

The Debtor intends to object to this claim; however, upon allowance by the court, the claim will be paid in full in equal monthly installments over a five year period with interest accruing at 6.75% per annum, beginning as of the Effective Date of the Plan. This claimant will maintain its lien until this obligation is paid in full.

### (f)    *Banex Capital, LLC*

This claim will be paid in full in equal monthly installments over a five year period with interest accruing at 5% per annum, beginning as of the Effective Date of the Plan. This claimant will maintain its lien until this obligation is paid in full.

### (g)    *Miami-Dade County Tax Collector*

This claim has been satisfied by agreement of Miami-Dade County Tax Collector, the scheduled claim will be disallowed in its entirety.  This claim is unimpaired and not entitled to vote.

**(4)    Cure Claims**

### (a)    *Maxus Capital SPE, LLC – Cure Claim*

This claim for the cure of defaults under the lease, pursuant to § 365(b)(1)(a), with a principal amount totaling $594,140, will be paid in equal monthly payments over a three year period, beginning as of the effective date of the Plan, plus 2 per cent interest.

### (b)    *Dell – Cure Claim*

The claim for the cure of defaults under the lease, pursuant to § 365(b)(1)(a), totaling $50,941.62, will be paid in 25 monthly installments in an amount equal to the monthly payment provided in each of the lease agreements.

### (c)    *Oceanside Isles Management – Cure Claim*

The claim for the cure of defaults under the lease, pursuant to § 365(b)(1)(a), totaling $8,164.10, will be paid in 12 monthly installments, beginning as of the effective date of the Plan.

**(5)**     **General Unsecured Claims**

**(a)**     *General Unsecured Claims of $1,000 or less*

These claims shall be paid in full on the Effective Date of the Plan. These claims are estimated to be $15,252.84.

**(b)**     *General Unsecured Claims of $1,001 or more*

These claims shall be paid in equal annual installments over six years. These claims are estimated to be $2,570,489.48.  Although the payments are paid to creditors one time per year, the Debtor intends to fund a monthly reserve for purpose of budgeting, and to ensure the annual payments to the general unsecured creditors.

**(6)**     **Equity Security Interests**

The holders of equity security interests in the Debtor shall retain their equity interests, subject only to dilution by the proposed equity investment sought by the Debtor.

**B.       Claimants and Impaired Interest Holders.**

Claimants and Interest Holders entitled to vote under the Plan must affirmatively act in order for the Plan to be confirmed by the Court. According to the Debtor's Plan, Classes 2(a)-(f), 3, and 5 are "impaired" classes within the meaning of §1124 of the Bankruptcy Code. These classes, accordingly, must vote to accept the Plan in order for the Plan to be confirmed without a cram down. A Claimant who fails to vote to either accept or reject the Plan will not be included in the calculation regarding acceptance or rejection of the Plan.

A Ballot to be completed by the holders of Claims and/or Interests is included herewith. Instructions for completing and returning the ballots are set forth thereon and should be reviewed at length. The Plan will be confirmed by the Bankruptcy Court and made binding upon all Claimants and Interest holders if (a) with respect to impaired Classes of Claimants, the Plan is accepted by holders of two-thirds (2/3) in amount and more than one-half (1/2) in number of Claims in each such class voting upon the Plan and (b) with respect to classes of Interest Holders, if the Plan is accepted by the holders of at least two-thirds (2/3) in amount of the allowed interests of such class held by holders of such interests. In the event the requisite acceptances are not obtained, the Bankruptcy Court may, nevertheless, confirm the Plan if it finds that the Plan accords fair and equitable treatment to any class rejecting it. Your attention is directed to § 1129 of the Bankruptcy Code for details regarding the circumstances of such "cram down" provisions.

**C.       Legal Proceedings.**

**(1)       Potential Bankruptcy Causes of Action**

The Debtor's potential causes of action, as set forth herein, will be pursued by the Debtor after the Effective Date.  The proceeds thereof, if any, will be used, in part, to make Distributions

under the Plan, including to holders of allowed general unsecured claims. The Debtor's causes of action, if any, are each preserved herein, and pursuant to the Plan.

In addition to causes of action that the Debtor may have under state and other federal laws, the Bankruptcy Code creates certain causes of action that allow a debtor to recover transfers it has made prior to its bankruptcy filing. The most common such causes of action are those to recover preferences and fraudulent transfers.

The attached Exhibit E reflects a non-exhaustive list of specific litigation claims retained by the Debtor for prosecution. The potential litigation claims listed in Exhibit E are claims the Debtor has identified but has not yet pursued; therefore, the Debtor is unable to place a value on any of the claims or provide a timeline for possible recovery or the likelihood of success. However, any monies recovered on any of the claims will be used to fund the Debtor's business operations and distributions to creditors under the Plan.

**THE PLAN DOES NOT, AND IS NOT INTENDED TO, RELEASE ANY SUCH OF CAUSES ACTION, AVOIDANCE ACTIONS, OR OBJECTIONS TO PROOFS OF CLAIM. ALL SUCH RIGHTS ARE SPECIFICALLY RESERVED IN FAVOR OF THE DEBTOR.**

Creditors should understand that legal rights, Claims, and Causes of Action the Debtor may have against them, if any exist, are retained under the Plan for prosecution unless a specific order of the Court authorizes the Debtor to release such Claims. As such, Creditors are cautioned not to rely on (i) the absence of the listing of any legal right, Claim or Cause of Action against a particular creditor in the Disclosure Statement, Plan, Schedules of Assets and Liabilities, or Statement of Financial Affairs; or (ii) the absence of litigation or demand prior to the Effective Date of the Plan as any indication that the Debtor does not possess or does not intend to prosecute a particular right, Claim, or Cause of Action if a particular Creditor votes to accept the Plan. It is the expressed intention of the Plan to preserve rights, Claims, and Causes of Action of the Debtor, whether now known or unknown, for the benefit of the Debtor's Estate and its Creditors.

**ANY CREDITOR OR PARTY IN INTEREST VOTING ON THE PLAN SHOULD ASSUME IN CONNECTION WITH SUCH VOTE THAT CAUSES OF ACTION EXIST AGAINST SUCH CREDITOR OR PARTY IN INTEREST AND THAT THE REORGANIZED DEBTOR INTENDS TO AND SHALL PURSUE SUCH CAUSES OF ACTION.**

What follows is a general discussion of the different types of causes of action the Debtor may pursue.

### *(a)    Preference Actions*

Under §§ 547 and 550 of the Bankruptcy Code, the Debtor may seek to avoid and recover certain payments or transfers made by the Debtor to or for the benefit of a creditor, within the ninety days prior to the petition date, in respect of an antecedent debt if such transfer was made

when the Debtor was insolvent.  Transfers made to a creditor that was an "insider" of the Debtor are subject to these provisions if the payment was made within one year of the Debtor's filing of a petition under Chapter 11.  Under § 547, certain defenses, in addition to the solvency of the Debtor at the time of the transfer, are available to a creditor from which a preference recovery is sought.  The Debtor has the initial burden of proof in demonstrating the existence of all the elements of a preference, although there is a rebuttable presumption that the Debtor was insolvent during the ninety days prior to the commencement of its bankruptcy case.  The creditor has the initial burden of proof as to any defenses.

### (b)  *Fraudulent Conveyances and Transfers*

Under §§ 548 and 550 of the Bankruptcy Code and under state law made applicable in bankruptcy cases by § 544(b) of the Bankruptcy Code, a debtor in possession or a trustee in bankruptcy, if a trustee is appointed or elected, may recover a transfer of property if the transfer was made while the debtor was insolvent, was unable to pay its debts as they mature, or has unreasonably small capital if, or to the extent, the debtor received less than reasonably equivalent consideration or fair value for such property and may recover a transfer made by the debtor with actual intent to hinder, delay or defraud its creditors.  Such rights of the debtor or trustee preclude any creditor as to whom a transfer was also fraudulent from pursuing a similar action unless the trustee declines to bring such action or to administer such claim.  Section 548 of the Bankruptcy Code applies to transfers made during the two years prior to the Petition Date.  Various State laws may provide a considerably longer period of up to six years within which such action may be brought.

### (c)  *Disallowance of Claims*

Under § 502(d) of the Bankruptcy Code, any Claim asserted by a creditor shall be disallowed in its entirety if such creditor has received a transfer, such as a preference or fraudulent transfer, which is voidable under the Bankruptcy Code and has failed to repay such transfer.

### (d)  *Specific Claims*

As of the filing of this Disclosure Statement the Debtor has not yet fully investigated potential preference and fraudulent conveyance Causes of Action under §§ 547, 548 and 544 of the Bankruptcy Code and applicable state law, but does believe that certain litigation claims exist.  The Debtor intends to file suit against certain former employees to recover pre-paid commissions.  The Debtor also intends to file suit against ARC Logistics Miami International, Inc.; the Departamento Administrativo de Seguridad; and Colvista, Ltda for money damages.  The Debtor may also seek to reduce the amount of the C3 Capital Partners, L.P. claim, and/or bring a claim against its replevin bond, for damages caused by C3 Capital Partners, L.P. to the Debtor's property during replevin.

### (2)    Preservation of Claims and Causes of Action

The Plan provides that the Debtor shall retain the right to prepare, file, pursue, prosecute, and settle the causes of action, whether or not such Causes of Action have been asserted or commenced as of the Effective Date, as a representative of the estate pursuant to § 1123(b)(3)(B) of the Bankruptcy Code.

To the extent that certain Causes of Action are filed by the Debtor, and are not resolved prior to the Effective Date, such Causes of Action will re-vest in the Debtor pursuant to the terms of the Plan.

### D.    Debtor's Post-Confirmation Structure.

### (1)    Equity Structure

Upon the Effective Date, the Debtor shall continue operations and shall have the same equity structure as existed as of the Petition Date.  A true and correct list of shareholders is attached as Exhibit F. Provided however that the Debtor is currently exploring an equity investment from a third party investor, in which case all current equity holdings would be diluted accordingly.  The five largest equity holders are:

| Shareholder | Number of Shares | Percentage |
|---|---|---|
| Dr. J. Al Esquivel Shuler & Family | 7,150,001 | 71.500 |
| Jose A. Esquivel | 438,160 | 4.382 |
| Charles R. Levy | 676,000 | 6.760 |
| Kennedy C. O'Herron | 300,000 | 3.000 |
| Thomas "Duke" Terry, Jr. | 220,000 | 2.200 |
| **Total Shares** | **8,784,161** | **87.842** |

### (2)    Officers

Upon the Effective Date, the Debtor's remaining officers shall continue as officers of the Reorganized Debtor,  Dr. J. Al Esquivel-Shuler shall retain his position as President.  Haydee Leknes shall retain her position as Vice President.

### (3)    Board of Directors

The Debtor's Board of Directors shall remain unchanged.

### (4)    Management

The Debtor shall continued to be managed by Dr. J. Al Esquivel-Shuler.  Dr. Shuler is a retired Naval officer with a Ph.D. in nuclear physics and nuclear engineering from Purdue University.  He formerly served as vice president of financial engineering for Eastern Airlines, Inc., and vice president of manufacturing for Fairchild Industries, Inc.   Dr. Shuler formed Phoenix Worldwide in 1982 and has managed its operations since its inception.

(5)     **Compensation**

Compensation for the officers and insiders shall remain unchanged.  Pursuant to the court and creditor-approved cash collateral budgets, Dr. Shuler and Haydee Leknes have been paid a monthly salary of $10,000 and $5,000, respectively.  Their compensation shall continue in this manner, subject to annual adjustments in the ordinary course of business.

**E.     Means for Implementing Plan.**

The funds required for the initial payments to creditors upon the Effective Date will come from continued commercial operations and, if necessary, from either an exit funding facility or an equity infusion (the "Exit Funding"). As is detailed in the Financial Projections, attached hereto at Exhibit C2, the Debtor is anticipating significant increases in its operating revenue based upon recent presentations and proposals submitted to numerous government agencies.  The following is a description of the Debtor's anticipated sources of operating revenues to fund the Plan, as described in the projections.  As discussed above in Section V, the Debtor's primary source of revenue during this case has been a contract with the U.S. Drug Enforcement Agency to outfit vehicles with the Debtor's surveillance equipment, including the intelligent video technology.  The finished product is referred to by the DEA as a "Smartcar."  To date the Debtor has delivered two Smartcars to the DEA.  The Debtor anticipates continued orders from the DEA for production of Smartcars.

While the Projections reflect a conservative order of one car per month, with a net profit of $52,095.40 per vehicle, the Debtor anticipates that the order rate will ultimately be higher.  A higher order rate will also improve the profit margin because the Debtor would benefit from volume purchasing for parts and supplies.

The Debtor has recently entered into a supply contract with Esenerji Sanayi Ticaret Ve Insaat Limited Sirketi, a Turkish company, to provide EnviorGuard[TM] Appliqué Coatings and Products, for a minimum purchase amount of $9 million over the next two years.  A true and correct copy of the supply contract, translated to English, is attached as Exhibit G.  Revenue from this supply contract is projected to commence in July 2010.  The Debtor is also currently in negotiations with a Saudi Arabian company for a similar contract.

The Debtor is also currently in various stages of negotiations on the following contracts:

- The Debtor is in negotiations with the largest roofing contractor in the United States for purchase of EnviroGuard[TM] products.

- The Debtor has been contacted by a prime U.S. contractor for the assembly of 320 military vehicles, at a rate of 3 vehicles per month.

- The Debtor is finalizing a lease agreement with a U.S. federal agency for a three year lease of an in stock intelligence vehicle, at lease rate of $10,000 per month, with the possibility of up to 52 additional leased vehicles at the same rate.

Simultaneously, the Debtor is exploring equity and debt alternatives for the Exit Funding to cover the Debtor's anticipated exit from chapter 11 in the event that the increased revenue is

delayed for any reason.  In the event the Exit Funding is the form of a debt facility, the Debtor expects to seek Court authority to incur the debt once a formal commitment letter is received from the anticipated lenders.  If the Exit Funding is in the form of equity, the Debtor does not believe additional Court approval will be required.  Although some of the Exit Funding will be utilized to make the initial payments required to be made under the Debtor's Plan, some of the Exit Funding will also be used to purchase required inventory, perform maintenance on machinery and equipment, which has been postponed during the bankruptcy case and to allow the Debtor sufficient funding to accept and complete orders as required by its customers.  Thus, the Debtor may require some of this Exit Funding to "ramp up" its operating condition to be ready for the anticipated work to be received from government agencies which are now ordering the Debtor's products again after the change in presidential administration.  Based upon the Debtor's 28 years of experience in this industry and recent proposals and presentations, the Debtor believes it is only a matter of time before it is requested to perform the required work.

## F.     U.S. Trustee Fees.

The Debtor shall pay the United Stated Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6) within ten (10) days of the entry of the confirmation order for pre-confirmation periods and simultaneously provide to the United States Trustee the monthly operating reports for each pre-confirmation period; and the reorganized debtor shall further file monthly operating reports for each post-confirmation period and pay the United States Trustee the appropriate sum required  pursuant to 28 U.S.C §1930(a)(6), until the earlier of the closing of this case by the issuance of Final Decree by the Court, or upon the entry of an Order by this Court dismissing this case or converting this case to another chapter under the United States Bankruptcy Code.

## G.     Executory Contract and Unexpired Leases.

The Bankruptcy Code gives the Debtor the power, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases.  Rejection or assumption may be effected pursuant to a plan of reorganization.  In addition to any executory contract or unexpired lease previously assumed or rejected pursuant to order of the Bankruptcy Court, and in addition to motions to assume executory contracts currently pending or which will be heard at or prior to confirmation, the Plan constitutes and incorporates any motion to:

**(1)     Assume the following executory contracts and unexpired lease:**

| LESSOR | EQUIPMENT OR SUBJECT |
|---|---|
| Maxus Capital SPE, LLC | Various sensors, platforms, and saw |
| Dell | Various computers and related equipment |
| Oceanside Isles Management | Lease of warehouse bay located at 10785 SW 188th Street, Miami, Florida |

26

**(2)      Reject all executory contracts and unexpired leases not listed in paragraph 1(a), above, or assumed pursuant to Final Order of the Bankruptcy Court.**

If the Bankruptcy Court has not previously entered an order approving assumption, rejection, and/or assignment of lease and executory contracts, then the Confirmation Order shall constitute an order of the Bankruptcy Court approving all such assumptions, assignments, and rejections of executory contracts and unexpired leases, as the case may be, as of the Effective Date.  Any monetary amounts by which the contracts and lease to be assumed under the Plan are in default shall be satisfied and agreed by the parties.

If an executory contract or unexpired lease is rejected, then the other party to the agreement may file a Claim for damages incurred by reason of rejection within such time as the Bankruptcy Court may allow.  In the case of rejection of employment agreements and leases of real property, damages are limited under the Bankruptcy Code.   The Debtor is aware of no other leases or executory contracts other than the proposed lease with Sunny Isles Fueling LLC.  To the extent there are any executory contracts or leases rejected by the Debtor, **ANY PROOF OF CLAIM FOR DAMAGES ARISING FROM THE REJECTION OF AN EXECUTORY CONTRACT OR LEASE MUST BE FILED WITH THE COURT WITHIN THIRTY DAYS AFTER THE ENTRY OF THE ORDER CONFIRMING THE PLAN.**

## VII. ALTERNATIVES TO PLAN AND LIQUIDATION ANALYSIS

All payments by the Debtor as provided for in the Plan shall be financed by the operation of the Debtor's business, recoveries from the Avoidance Actions, and other recoveries made by the Debtor.

There are three possible consequences if the Plan is rejected or if the Bankruptcy Court refuses to confirm the Plan: (a) the Bankruptcy Court could dismiss the Debtor's Chapter 11 Bankruptcy Case, (b) the Debtor's Chapter 11 Bankruptcy Case could be converted to a liquidation case under Chapter 7 of the Bankruptcy Code, or (c) the Bankruptcy Court could consider an alternative plan of reorganization proposed by the Debtor or by some other party.

**A.      Dismissal.**

The most remote possibility is dismissal. If the Debtor's Bankruptcy Case was to be dismissed, the Debtor would no longer have the protection of the Bankruptcy Court and the applicable provisions of the Bankruptcy Code. Dismissal would force a race among creditors to take over and dispose of the Debtor's available assets. Even the most diligent unsecured creditors would likely fail to realize any significant recovery on their claims.

**B.      Chapter 7 Liquidation.**

If the Plan is not confirmed, it is likely that the Debtor's Bankruptcy Case will be converted to a case under Chapter 7 of the Bankruptcy Code, in which case a trustee would be

appointed to liquidate the Debtor's assets for distribution to creditors in accordance with the priorities established by the Bankruptcy Code. Whether a bankruptcy case is one under Chapter 7 or Chapter 11, Secured Claims, Administrative Claims, and Priority Unsecured Claims are entitled to be paid in full before unsecured creditors receive any funds.

It is likely that the Chapter 7 trustee would have little or no experience or knowledge of the Debtor's business, records, or assets. A substantial period of education would be required for any Chapter 7 trustee to windup the case effectively. Moreover, the Debtor possesses certain licenses and approvals to sell assets to government agencies. Because the Trustee may not enjoy the benefits of these licenses and approvals, a liquidation by a Trustee may yield a significantly lower recovery from the sale of the Debtor's assets.

The Chapter 7 trustee would be entitled to receive the compensation allowed under Bankruptcy Code § 326. The trustee's compensation is based on 25% of the first $5,000 or less; 10% of any amount in excess of $5,000 but not in excess of $50,000; 5% of any amount in excess of $50,000 but not in excess of $1,000,000; and reasonable compensation not to exceed 3% percent of any amount in excess of $1,000,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims.

Attached hereto marked Exhibit D is a table showing all of the claims of Debtor in each classification.

Predicated upon the foregoing, it is management's opinion that the liquidation value of the Debtor would be insufficient to make payments to any class of creditors other than the Secured Creditors, leaving no monies available for the claims of any other classes of creditors such as general unsecured creditors.


## VIII. RISK ANALYSIS

The Debtor believes there is minimal risk to the creditors if the Plan is confirmed.  As illustrated in the Litigation Analysis, there would be no funds available to distribute to unsecured creditors if the case were converted to a Chapter 7 proceeding.  As a result, the Plan provides for a distribution to unsecured creditors that they would not receive if this case were converted to one under Chapter 7.

However, there are risks to unsecured creditors in confirming the Plan.  Because the Plan funding relies primarily on the revenues generated in the operation of the Debtor's business, the Plan bears the risks inherent to the operation of any business including, but not limited to, market fluctuations, changes in the credit market, the price and availability of production materials, and the Debtor's ability to attract and maintain a client base.  Additionally, although the Debtor is diligently pursuing sources of Exit Funding, there is a risk that the Debtor will be unable to secure such funding.

There are also risks to secured creditors in confirming the Plan.  The risks to secured creditors include, but are not limited to, a potential decrease in value of the secured collateral due to continued use of the collateral in the Debtor's operations.

While acknowledging there are risks inherent to both confirmation and liquidation, the Debtor believes that a greater recovery is possible for all creditors through confirmation of the Plan.

## IX. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

A summary description of certain United States federal income tax consequences of the Plan is provided below.  The description of tax consequences below is for informational purposes only and, due to lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various U.S. federal income tax consequences of the Plan as discussed herein.  Only the potential material U.S. federal income tax consequences of the Plan to the Debtor and to a typical holder of claims and interests who are entitled to vote or to accept or reject the Plan are described below.  No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan, and no tax opinion is being given in this Disclosure Statement.  No rulings or determination of the Internal Revenue Service (the "IRS") or any other tax authorities have been sought or obtained with respect to any tax consequences of the Plan, and the discussion below is not binding upon the IRS or such other authorities.  No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Plan to the Debtor or to any holder of claims or interests.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of the U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated and proposed thereunder, judicial authorities, and administrative rulings and pronouncements of the IRS and other applicable authorities, all as in effect on the date of this document. Legislative, judicial, or administrative changes or interpretations enacted or promulgated in the future could alter or modify the analyses and conclusions set forth below.  It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences to the holders of claims and interests (the "Claimants").  Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences discussed below.

**THIS DISCUSSION DOES NOT ADDRESS FOREIGN, STATE, OR LOCAL TAX CONSEQUENCES OF THE PLAN, NOR DOES IT PURPORT TO ADDRESS THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO SPECIAL CLASSES**

**OF TAXPAYERS (SUCH AS FOREIGN ENTITIES, NONRESIDENT ALIEN INDIVIDUALS, PASS-THROUGH ENTITIES SUCH AS PARTNERSHIPS AND HOLDERS THROUGH SUCH PASS-THROUGH ENTITIES, S CORPORATIONS, MUTUAL FUNDS, INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, SMALL BUSINESS INVESTMENT COMPANIES, REGULATED INVESTMENT COMPANIES, CERTAIN SECURITES TRADERS, BROKER-DEALERS AND TAX-EXEMPT ORGANIZATIONS). FURTHERMORE, ESTATE AND GIFT TAX ISSUES ARE NOT ADDRESSED AND TAX CONSEQUENCES RELATING TO THE ALTERNATIVE MINIMUM TAX ARE GENERALLY NOT DISCUSSED.**

**NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLAN TO ANY HOLDER OF A CLAIM OR INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT A TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.**

**A.      U.S. Federal Income Tax Consequences to the Debtor.**

**(1)      Cancellation of Indebtedness Income**

Generally, the discharge of a debt obligation owed by a debtor for an amount less than the "adjusted issue price" (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments) gives rise to cancellation of indebtedness ("COD") income to the debtor, subject to certain rules and exceptions.  However, when the discharge of indebtedness occurs pursuant to a plan approved by the Bankruptcy Court in a case under title 11 of the Bankruptcy Code (e.g., a chapter 11 case), there is a special rule under the Tax Code that specifically excludes from a debtor's income the amount of such discharged indebtedness (the so-called "bankruptcy exception").  Instead, certain of the debtor's tax attributes otherwise available generally must be reduced by the amount of the COD income that is excluded from the debtor's income.  Such reduction of tax attributes generally occurs in the following order: (i) net operating losses and net operating loss carryovers (collectively, "NOLs"), (ii) general business credits, (iii) minimum tax credits, (iv) capital loss carryovers, (v) the tax basis of debtor's property (both depreciable and non-depreciable), (vi) passive activity loss and credit carryovers, and (vii) foreign tax credit carryovers (although there is a special rule in the Tax Code which allows the debtor to elect to first reduce the tax basis of depreciable property before having to reduce NOLs and other attributes).

Under current Income Tax Regulations, the availability of the "bankruptcy exception" in the context of an affiliated group is made on a "separate entity" basis and not on an "affiliated group" basis.  In addition, with regard to tax attribute reduction in the context of an affiliated group, recently adopted Income Tax Regulations (§ 1.1502-28) suggest a "hybrid" method of

attribute reduction. Under the current Tax Regulations only member corporations can file on a consolidated tax basis.

Under these regulations, the tax attributes of the separate corporate member having excluded COD income is first reduced, followed by a reduction of the tax attributes of the subsidiary members (to the extent of any stock basis reduction). Then, to the extent a corporate member's excluded COD income exceeds that corporate member's separate entity tax attributes, the consolidated tax attributes allocated to the other corporate members are proportionately reduced.

## B.    U. S. Federal Income Tax Consequences to a Investor Typical of the Holders of Claims and Interests.

The U.S. federal income tax consequences of the implementation of the Plan to the Claimants, typical of the holders of claims and interests who are entitled to vote to confirm or reject the Plan, will depend on a number of factors, including (i) whether the Claim constitutes a "security" for U.S. federal income tax purposes, (ii) the nature and origin of the Claim, (iii) the manner in which the holder acquired the Claim, (iv) the length of time the Claim has been held, (v) whether the Claim was acquired at a discount, (vi) whether the holder has taken a bad debt deduction or loss with respect to the Claim (or any portion thereof) in the current year or in any prior year, (vii) whether the holder has previously included in its taxable income accrued but unpaid interest with respect to the Claim; (viii) the Holder's method of tax accounting, (ix) whether the Claim is an installment obligation for U.S. federal income tax purposes, and (x) the timing of any distributions under the Plan.

### (1)    Gain or Loss Recognition on the Satisfaction of Claims and Character of Gain or Loss

Claimants will generally not recognize gain, but may recognize loss, with respect to the amount in which the Claimants receive on their claims (generally, the amount of cash and the fair market value of any other property received in satisfaction of the Debtor's obligations) that either exceeds, on one hand, or is less than, on the other hand, the Claimant's basis in the Claim. Thus, it is possible that certain Claimants may recognize a gain or loss as a result of distributions under the Plan.

In general, gain or loss is recognized by any such Claimant is either capital or ordinary in character. The character is dependent upon the underlying nature of the claim and whether such claim, in the hands of the Claimant, constitutes a capital asset. To the extent that a debt instrument is acquired after its original issuance for less than the issue price of such instrument, it will have market discount. A holder of a claim with market discount must treat any gain recognized on the satisfaction of such Claim as ordinary income to the extent that it does not exceed the market discount that has already been accrued with respect to such claim. There may also be state, local or foreign tax considerations applicable to particular holders of claims, none of which are discussed herein. **Claimants should consult their own tax advisors for**

information that may be relevant to their particular situations and circumstances and the particular tax consequences to them of the transactions contemplated by the Plan.

### (a)    Holders of Disputed Claims

Although not free from doubt, holders of disputed claims should only be required to report their gain or loss on the cash or other property that is ultimately distributed out to the Claimant free from any further restrictions.  **Holders of disputed claims are urged to consult their own tax advisors regarding the taxation of their disputed claims and the timing and amount of income or loss recognized relating to the Disputed Claims Reserve.**

### (b)    Information Reporting and Backup Withholding

Certain payments, including payments in respect of accrued interest or market discount, are generally subject to information reporting by the payor to the IRS.  Moreover, such reportable payments may be subject to backup withholding.  Under the Tax Code's backup withholding rules, a U.S. claimant may be subject to backup withholding at the applicable rate with respect to certain distributions or payments pursuant to the Plan, unless the Claimant:  (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact; or (ii) provides a correct U.S. taxpayer identification number and certifies under penalty of perjury that the holder is a U.S. person, the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income.  Payments made to Foreign Claimants may also be subject to withholding, which may be reduced under an applicable Treaty.

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a holder's U. S. federal income tax liability, and a the Claimant may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

### C.    Importance of Obtaining Professional Tax Assistance.

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U. S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIMHOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIMHOLDERS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL, AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN, INCLUDING WITH RESPECT TO TAX REPORTING AND RECORD KEEPING REQUIREMENTS.**

**D.      Circular 230 Disclaimer.**

THE IRS REQUIRES WRITTEN ADVICE REGARDING ONE OR MORE U.S. FEDERAL TAX ISSUES TO MEET CERTAIN STANDARDS.  THOSE STANDARDS INVOLVE A DETAILED AND CAREFUL ANALYSIS OF THE FACTS AND APPLICABLE LAW WHICH WE EXPECT WOULD BE TIME CONSUMING AND COSTLY.  WE HAVE NOT MADE AND HAVE NOT BEEN ASKED TO MAKE THAT TYPE OF ANALYSIS IN CONNECTION WITH ANY ADVICE GIVEN IN THE FOREGOING DISCUSSION.  AS A RESULT, WE ARE REQUIRED TO ADVISE YOU THAT ANY U.S. FEDERAL TAX ADVICE RENDERED IN THE FOREGOING DISCUSSION IS NOT INTENDED OR WRITTEN TO BE USED AND CANNOT BE USED FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED BY THE IRS.

## X. ACCEPTANCE AND CONFIRMATION OF PLAN

As a condition of confirmation of the Plan, the Bankruptcy Code requires that the Court determine that: (i) the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and (ii) that the Debtor's disclosures concerning the Plan have been adequate and have included information concerning all payments made or promises by the Debtor in connection with the Plan and the Chapter 11 Case.

Section 1129 of the Bankruptcy Code, which sets forth the requirements that must be satisfied in order for the Plan to be confirmed, lists the following requirements for the approval of any plan of reorganization:

1.      A plan must comply with the applicable provisions of the Bankruptcy Code, including, *inter alia*, § 1123(a)(4), which provides that a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest.  Such anti-discrimination provision applies to contingent claims (such as guaranty claims) as well as all other claims and interests.

2.      The proponent of a plan must comply with the applicable provisions of the Bankruptcy Code.

3.      A plan must be proposed in food faith and not by any means forbidden by law.

4.      Any payment made or to be made by the proponent, by the Debtor, or by a person issuing securities or acquiring property under a plan, for services or for costs and expenses in or in connection with the case, or in connection with such plan and incident to the case, must be approved by, or by subject to the approval of, the court as reasonable.

5.    (i)    (A)    The proponent of a plan must disclose the identity and affiliations of any individual proposed to serve, after confirmation of such plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under such plan;  and

(B)    The appointment to, or continuance in, such officer or such individual, must be consistent with the interests of creditors and equity security holders and with public policy; and;

(ii)    The proponent of a plan must disclose the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation of each insider.

6.    Any governmental regulatory commission with jurisdiction, after confirmation of a plan, over the rates of the Debtor must approve any rate change provided for in such plan, or such rate change is expressly conditioned on such approval.  The Debtor's Plan proposes no such change, nor does the Debtor have rates over which any governmental authority exercises jurisdiction.

7.    Each holder of a claim or interest in an impaired class of claims or interest must have accepted the plan or must receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date;  or, if the class is a class of secured claims that elects non-recourse treatment of the claims under § 1111(b) of the Bankruptcy Code, each holder of a claim in such class will receive or retain under the plan  on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

8.    With respect to each class of claims or interest, such class must accept the plan or not be impaired under the plan (subject to the "cramdown" provisions discussed above and below under "Confirmation Without Acceptance By All Impaired Classes.")

9.    Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, a plan must provide that:

a.    with respect to an administrative claim and certain claims in an involuntary case, on the effective date of the Plan, the holder of the claim will receive on account of such claim cash equal to the allowed amount of the claim;

b.    with respect to a class of priority wage, employee benefit, consumer deposit and certain other claims described in §507(a)(3)-(6) of the Bankruptcy Code, each holder of a claim of such class will receive:

(1) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim;

(2)      if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim.

c.      with respect to a priority tax claim of a kind specified in § 507(a)(8) of the Bankruptcy Code, the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding six (6) years after the date of assessment of such claim, of a value, as of the date of assessment of such claim of a value, as of the effective date of the plan equal to the allowed amount of such claim.

10.    If a class of claims is impaired under a plan, at least one class of claims that is impaired under such plan must have accepted the plan, determined without including any acceptance of the plan by any insider.

11.    Confirmation of a plan must not be likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.  This is the so-called "feasibility" requirement.

12.    All fees payable under § 1930 of title 28 of the United States Code, as determined by the Court at the hearing on confirmation of the plan, must have been paid or the plan must provide for the payment of all such fees on the effective date of the plan.

13.    A plan must provide for the continuation after its effective date of payment of all retiree benefits, as that term is defined in §1114 of the Bankruptcy Code, at the level established pursuant to §1114(e)(1)(B) or (g) of the Bankruptcy Code, at any time prior to confirmation of such plan, for the duration of the period the debtor has obligated itself to provide such benefits. The Debtor has no such benefits.

This Disclosure Statement discusses three of these requirements: (a) the feasibility of the Plan; (b) acceptance by impaired classes; and (c) the minimum value standard.  Further, the required disclosures described in paragraph (5) above are also contained herein.  The Debtor believes that the Plan meets all the requirements of §1129(a) of the Bankruptcy Code (other than as to voting, which has not taken place) and will seek a ruling of the Court to this effect at the hearing on confirmation of the Plan.  You are urged to consult your own counsel to evaluate each and every one of the standards for confirmation of the Plan under the Bankruptcy Code.

## XI. RELEASE PROVISIONS

**A.     Injunction.**

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE CONFIRMATION ORDER, OR A SEPARATE ORDER OF THE BANKRUPTCY COURT, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS AGAINST OR EQUITY INTEREST IN THE DEBTOR AND OTHER PARTIES IN INTEREST, ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, OR PRINCIPALS, ARE PERMANENTLY ENJOINED, ON AND AFTER THE EFFECTIVE DATE, FROM (I) COMMENCING OR CONTINUING IN ANY MANNER, ANY ACTION, OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTOR OR REORGANIZED DEBTOR WITH RESPECT TO ANY SUCH CLAIM OR EQUITY INTEREST; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS OF ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DEBTOR OR REORGANIZED DEBTOR ON ACCOUNT OF ANY SUCH CLAIM OR EQUITY INTEREST; (III) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST THE DEBTOR OR REORGANIZED DEBTOR OF ANY SUCH CLAIM OR EQUITY INTEREST; (IV) COMMENCING OR CONTINUING IN ANY MANNER, ANY ACTION, OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY CLAIMS AND CAUSES OF ACTION WHICH ARE EXTINGUISHED OR RELEASED PURSUANT TO THE PLAN; AND (V) TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN.

**B.     Terms of Injunctions or Stays.**

UNLESS OTHERWISE PROVIDED IN THE PLAN, THE CONFIRMATION ORDER, OR A SEPARATE ORDER OF THE BANKRUPTCY COURT, ALL INJUNCTIONS OR STAYS ARISING UNDER OR ENTERED DURING THE CHAPTER 11 CASE UNDER §§ 105 OR 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE LATER OF THE EFFECTIVE DATE OR THE DATE INDICATED IN SUCH APPLICABLE ORDER.

NOTWITHSTANDING ANYTHING TO THE CONTRARY SET FORTH HEREIN, THE FOREGOING RELEASES AND INJUNCTIONS SHALL NOT PROHIBIT OR IMPAIR THE RIGHTS OF ANY PARTIES TO COMMENCE OR PURSUE ACTIONS BASED ON FRAUD OR VIOLATIONS OF APPLICABLE SECURITIES LAW.

## XII. MISCELLANEOUS PROVISIONS

(A)     Notwithstanding any other provisions of the Plan, any claim which is scheduled as disputed, contingent, or unliquidated or which is objected to in whole or in part on or before the date for distribution on account of such claim shall not be paid in accordance with the provisions of the Plan until such claim has become an Allowed Claim by a final Order. If allowed, the claim shall be paid on the same terms as if there had been no dispute.

(B)     At any time before the Confirmation Date, the Debtor may modify the Plan, but the Debtor may not modify the Plan so that the Plan, as modified, fails to meet the requirements of § 1122 and § 1123 of the Bankruptcy Code. After the Debtor files a modification with the Bankruptcy Court, the Plan, as modified, shall become the Amended Plan.

(C)     At any time after the Confirmation Date, and before substantial consummation of the Plan, the Debtor may modify the Plan with permission of the Court so that the Plan, as modified, meets the requirements of § 1122 and § 1123 of the Bankruptcy Code. The Plan, as modified under this paragraph, shall become the Amended Plan.

(D)     After the Confirmation Date, the Debtor may, with approval of the Bankruptcy Court, and so long as it does not materially and adversely affect the interest of creditors, remedy any defect or omission, or reconcile any inconsistencies in the Plan or in the Order of Confirmation, in such manner as may be necessary to carry out the purposes and effect of the Plan.

(E)     Pursuant to § 1125(e) of the Bankruptcy Code, the transmittal of Plan solicitation packages (including Disclosure Statement and the Plan), the Debtor's solicitation of acceptances of the Plan, and the Reorganized Debtor's and any other person's participation in such activities are not and will not be governed by or subject to any otherwise applicable law, rule or regulation governing the solicitation of acceptance or rejection of a plan of reorganization or the offer, issuance, sale or purchase of securities.

## XIII. EFFECT OF CONFIRMATION OF PLAN

### A.     Discharge.

This Plan provides that upon the Effective Date, Debtor shall be discharged of liability for payment of debts incurred before confirmation of the Plan, to the extent specified in 11 U.S.C. § 1141. However, any liability imposed by the Plan will not be discharged.

### B.     Re-vesting of Property in the Debtor.

Except as provided in the Plan, the confirmation of the Plan re-vests all of the property of the estate in the Debtor.

### C.     Final Decree.

Once the estate has been fully administered as referred to in Bankruptcy Rule 3022, the Debtor, or such other party as the Court shall designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case.

## XIV. CONCLUSION

THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS DESIRABLE AND IN THE BEST INTERESTS OF CREDITORS AND INTEREST HOLDERS.  The Plan provides for an equitable and early distribution of all Classes of the Debtor's creditors and reserves value, subject to certain restrictions, for equity security holders.  Any alternative to confirmation of the Plan, such as liquidation under Chapter 7 of the Bankruptcy Code or attempts by another party in interest to file a plan, would result in significant delays, litigation, and cost. More importantly, the Plan proposes a distribution to unsecured creditors substantially greater than such creditors would receive in the absence of this Plan.  The Debtor believes that a plan filed by another party in interest could only be confirmed over the objection of one or more impaired Classes, and would generate costly and time-consuming litigation.  Any delays in the confirmation of this Plan would jeopardize the viability of the Debtor as a going concern, and therefore diminish the high probability of a distribution in full to unsecured creditors to mere possibility.  As described in Section VII(B) "Liquidation Analysis," the Debtor believes that its creditors will receive greater recoveries under the Plan than those which could otherwise be achieved.   FOR THESE REASONS, THE DEBTOR URGES YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN.

Respectfully submitted this 6<u>th</u> day of July, 2010

BAST AMRON LLP
*Counsel for Debtor in Possession*
SunTrust International Center
One Southeast Third Avenue
Suite 1440
Miami, Florida 33131
Telephone: 305.379.7904
Facsimile:  305.379.7905
Email: jbast@bastamron.com
Email: dquick@bastamron.com

By:    */s/ Jeffrey P. Bast*
 Jeffrey P. Bast, Esq. (FBN 996343)
 Dana R. Quick, Esq. (FBN 0074402)

PHOENIX WORLDWIDE INDUSTRIES, INC.

By: _____
 Name: _____
 Title: _____

38

# Exhibit A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

In re:                                                    Case No. 09-23201-BKC-RAM

PHOENIX WORLDWIDE INDUSTRIES,            Chapter 11
INC.,

      Debtor.

_____/

**DEBTOR IN POSSESSION'S FIRST AMENDED**
**PLAN OF REORGANIZATION**

      Dated: June _____, 2010

BAST AMRON LLP
*Counsel to the Debtor in Possession*
SunTrust International Center
One Southeast Third Avenue
Suite 1440
Miami, Florida 33131
Phone: (305) 379-7904
Fax: (305) 379-7905
Email: jbast@bastamron.com
Email: dquick@bastamron.com


By: ___*/s/ Jeffrey P. Bast*_____
    Jeffrey P. Bast, Esq. (FBN 996343)
    Dana R. Quick, Esq. (FBN 0074402)

## TABLE OF CONTENTS

**Article I:** Definitions ........................................................................................3

**Article II:** Classification of Claims ....................................................................6

**Article III:** Provisions or Payment of Claims of Creditors ...................................7

**Article IV:** Designation of Impaired and Not Impaired Classes .........................10

**Article V:** Provisions Covering Distribution, General Provisions ......................10

**Article VI:** Executory Contracts .......................................................................11

**Article VII:** Procedure for Resolving Contested Claims ....................................11

**Article VIII:** Provisions for Retention of Jurisdiction for Supervision of the Plan .............12

**Article IX:** Provision to Invoke Cramdown Provision if Necessary ...................12

**Article X:** Notices ...........................................................................................12

**Exhibits:**

Assumed Contracts ...........................................................Exhibit 1

## INTRODUCTION

The Debtor in Possession, Phoenix Worldwide Industries, Inc., hereby proposes this Plan of Reorganization (as defined more fully below, the "Plan") pursuant to Section 1121 of the United States Bankruptcy Code.

Reference is made to the Disclosure Statement (as defined more fully below, the "Disclosure Statement") accompanying this Plan for a discussion of, among other things, the major events of this Chapter 11 Case, treatment of Claims against and interests in the Debtors, preservation of litigation claims, risk factors, liquidation analysis, tax implications, alternatives to the Plan, a summary and analysis of this Plan, and certain related matters.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3018, AND IN THIS PLAN, THE DEBTOR RESERVES THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE, OR WITHDRAW THIS PLAN PRIOR TO THE EFFECTIVE DATE (DEFINED BELOW).

## ARTICLE I
## DEFINITIONS

As used in this Plan, the following terms shall have the respective meanings specified below, unless the context otherwise requires:

1.1     <u>Administrative Creditor</u>. Any creditor entitled to payment of an administrative expense claim.

1.2     <u>Administrative Expense Claim</u>. Any cost or expense of administration of the Chapter 11 case allowed under Section 503(b) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the debtor's estate; any actual and necessary expenses of operating the business of the debtor, including loans or other advances to the debtor in possession, and all allowances of compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under Section 330 of the Bankruptcy Code; and any fees or charges assessed against the Debtor's estate under Chapter 123 of Title 28, United States Code.

1.3     <u>Allowed Claim</u>. Any claim against the Debtor, proof of which was filed on or before the claims bar date, or which has been or hereafter is listed by the debtor as liquidated in amount and not disputed or contingent and, in either case, a claim as to which no objection to the allowance thereof has been interposed within the applicable period of limitation fixed by the Bankruptcy Code or the Bankruptcy Rules, or as to which any objection has been determined by a Final Order. Unless otherwise specified herein, "Allowed Claim" shall not include interest on the principal amount of such claim from and after the petition date.

3

1.4     Bankruptcy Code. The United States Bankruptcy Code, as amended, and as set forth in Section 101, et seq., of Title 11, United States Code.

1.5     Bankruptcy Court. The United States Bankruptcy Court for the Southern District of Florida, having jurisdiction over this Chapter 11 case.

1.6     Bankruptcy Rules. The Federal Rules of Bankruptcy Procedure, as amended, as applicable to cases pending before the Bankruptcy Court.

1.7     Chapter 11 Case. The Chapter 11 case which commenced on June 29, 2009, in which the Debtor is PHOENIX WORLDWIDE INDUSTRIES, INC.

1.8     Claim. Any right to payment from PHOENIX WORLDWIDE INDUSTRIES, INC., whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, un-matured, disputed, undisputed, legal, equitable, secured or unsecured, or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from PHOENIX WORLDWIDE INDUSTRIES, INC., whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, un-matured, disputed, undisputed, secured, or unsecured.

1.9     Common Stock. The presently issued and outstanding common stock of PHOENIX WORLDWIDE INDUSTRIES, INC.

1.10    Confirmation Date. The date upon which the Bankruptcy Court, District Court or other appellate court shall enter an Order confirming this Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code, or if the operation of such Order is stayed, the date upon which such stay expires or is vacated.

1.11    Confirmation Order. Order of the Bankruptcy Court, District Court, or other appellate Court confirming this Plan.

1.12    Contested Claim. Any claim as to which PHOENIX WORLDWIDE INDUSTRIES, INC., or any other party in interest has interposed an objection in accordance with the Bankruptcy Code and the Bankruptcy Rules, which objection has not been withdrawn or determined by a Final Order.

1.13    Consummation Date. The date on which the Confirmation Order shall become a Final Order.

1.14    Creditor. Any person that is the holder of a claim against PHOENIX WORLDWIDE INDUSTRIES, INC., that arose on or before the Petition Date, or a claim against the debtor's estate of any kind, specified in Section 502(g), 502(h) or 502(i) of the Bankruptcy Code.

1.15    Debtor. PHOENIX WORLDWIDE INDUSTRIES, INC.

1.16    Debtor-in-Possession. PHOENIX WORLDWIDE INDUSTRIES, INC.

1.17    District Court. The United States District Court for the Southern District of Florida.

1.18    Effective Date of the Plan, or Effective Date. Thirty days after the date on which the confirmation order entered by the United States Bankruptcy Court shall become final.

1.19    Equity Interest. Any equity interest in PHOENIX WORLDWIDE INDUSTRIES, INC., by represented by Common Stock.

1.20    Final Order. An order or a judgment which has not been reversed, stayed, modified, or amended and as to which the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing is pending.

1.21    Impaired Claim. Any class of creditors whose claims are impaired by payments as proposed in this plan, in accordance with Section 1124 of the Bankruptcy Code.

1.22    Person. An individual, a corporation, a partnership, an association, a joint stock company, a joint venture, an estate, a trust, any unincorporated organization, or a government or any political subdivision thereof or entity.

1.23    Petition Date. June 29, 2009, the date on which an Order for Relief was entered by the Court, which order commenced this Chapter 11 case.

1.24    Plan. The Plan of Reorganization, either in its present form or as it may be altered, amended, or modified from time to time.

1.25    Priority Claims. Any claim, other than an administrative expense or a tax claim, to the extent entitled to priority in payment under Section 507(a) of the Bankruptcy Code.

1.26    Priority Creditor. Any creditor that is the holder of a priority claim.

1.27    Priority Non-Tax Claim. Any claim to the extent entitled to priority in payment under Section 507(a)(3), (4), (5), (6), or (7) of the Bankruptcy Code.

1.28    Priority Tax Claim. Any claim to the extent entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

1.29    Rejected Contract. Any unexpired lease or executory contract not assumed in the Plan.

1.30    Tax Creditor. Any creditor that holds a tax claim.

1.31    Ultimately Allowed Claim. Any contested claim that becomes an allowed claim.

1.32    Unimpaired Claim. Any class of creditors whose claims are not impaired under this Plan in accordance with Section 1124 of the Bankruptcy Code.

1.33    Unsecured Claim. All claims other than administrative expense claims, secured claims, priority claims, and tax claims.

5

1.34    <u>Unsecured Creditor</u>. Any creditor that is the holder of an unsecured claim.


## ARTICLE II
## CLASSIFICATION OF CLAIMS

Claims and interests are divided into the following classes:

<u>Class 1</u>.  Priority Non-Tax Claims

<u>Class 2</u>.  Secured Claims

       2(a): Miami-Dade County Building Department

       2(b): Zions First National Bank

       2(c): Maxus Capital Group, LLC

       2(d): C3 Capital Partners

       2(e): PPTS 1, LLC

       2(f): Banex Capital, LLC

       2(g): Miami Dade County Tax Collector

<u>Class 3</u>.  Cure Claims.

       3(a): Maxus Capital SPE, LLC

       3(b): Dell

       3(c): Oceanside Isles

<u>Class 4</u>.  General Unsecured Claims.

       4(a): General unsecured claims without priority equal to or less than $1,000; or general unsecured claimholders who elect to reduce their claims to $1,000.

       4(b): General unsecured claims of $1,001 or more.

<u>Class 5</u>:  Equity Security Holders of the Debtor.

## ARTICLE III
## PROVISIONS FOR PAYMENT OF CLAIMS OF CREDITORS

The treatment of and consideration to be received by holders of Allowed Claims or Allowed Interests pursuant to this Article III and the Plan shall be in full satisfaction, settlement, release, extinguishment, and discharge of their respective Claims against or Interests in the Debtor and the Estate, except as otherwise provided in the Plan or the Confirmation Order. The holders of Liens satisfied, discharged, and released under the Plan shall execute any and all documentation reasonably requested by the Debtor or the Reorganized Debtor evidencing the satisfaction, discharge and release of such Liens.

3.1    Administrative Expenses:  Unless otherwise provided for herein, each holder of an Allowed Administrative Claim shall receive, in full satisfaction, settlement, release and discharge of such Allowed Administrative Claim, either (A) an amount equal to the unpaid amount of such Allowed Administrative Claim in Cash commencing on the later of (i) the Effective Date, (ii) the date that such Claim becomes an Allowed Administrative Claim by a Final Order, or (iii) a date agreed to by the Claimholder and the Debtor; or (B) such other treatment (i) as may be agreed upon in writing by the Claimholder and the Debtor, or (ii) as the Bankruptcy Court has ordered or may order. Notwithstanding the foregoing, Allowed Administrative Claims representing (a) liabilities, accounts payable or other Claims or obligations incurred in the ordinary course of business of the Debtor consistent with past practices subsequent to the Petition Date, and (b) contractual liabilities arising under contracts, loans or advances to the Debtor, whether or not incurred in the ordinary course of business of the Debtor subsequent to the Petition Date, shall be paid or performed by the Debtor in accordance with the terms and conditions of the particular transactions relating to such liabilities and any agreements or contracts relating thereto; provided, notwithstanding any contract provision, applicable law or otherwise, that entitles a holder of an Allowed Administrative Claim to post-petition interest, no holder of an Allowed Administrative Claim shall receive post-petition interest on account of such Claim. Administrative expenses are presently estimated to be approximately $85,000.

3.2    Priority Tax Claims:  Each holder of an Allowed Priority Tax Claim shall receive, at the sole discretion of the Debtor, and in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, (A) an amount equal to the unpaid amount of such Allowed Priority Tax Claim in Cash commencing on the later of (i) the Effective Date, (ii) the date that such Claim becomes an Allowed Priority Tax Claim by a Final Order, or (iii) a date agreed to by the Claimholder and the Debtor; (B) as provided in section 1129(a)(9)(C) of the Bankruptcy Code, cash payments made in equal monthly installments beginning on the Effective Date, with the final installment payable not later than the sixtieth (60th) month following the Petition Date, together with interest (payable in arrears) on the unpaid portion thereof at 5% from the Effective Date through the date of payment thereof; or (C) such other treatment as to which the Debtor and such Claimholder shall have agreed in writing or the Bankruptcy Court has ordered or may order; provided, however, that the Debtor reserves the right to pay any Allowed Priority Tax Claim, or any remaining balance of any Allowed Priority Tax Claim, in full at any time on or after the Effective Date without premium or penalty; and, provided further, that no holder of an Allowed Priority Tax Claim shall be entitled to any payments on account of any pre-Effective Date interest accrued on or penalty arising before or

7

after the Petition Date with respect to or in connection with such Allowed Priority Tax Claim.

The following claims comprise all of the Priority Tax Claims:  Miami-Dade County Tax Collector for intangibles tax ($502.07); IRS ($674,806.27); Arizona Department of Revenue ($1,762.71); Florida Department of Revenue corporate income tax ($300.00); Florida Department of Revenue unemployment tax ($1,304.25); Commonwealth of Pennsylvania ($1,119.70); and Pennsylvania unemployment tax ($20.25).

3.3    Class 1 - Priority Non-Tax Claims:

Unless otherwise provided for herein, each holder of an Allowed Priority Non-Tax Claim shall receive either (A) an amount equal to the unpaid amount of such Allowed Priority Non-Tax Claim in Cash commencing on the later of (i) the Effective Date, (ii) the date that such Claim becomes an Allowed Priority Non-Tax Claim by a Final Order, or (iii) a date agreed to by the Claimholder and the Debtor; or (B) such other treatment (i) as may be agreed upon in writing by the Claimholder and the Debtor or the Reorganized Debtor, or (ii) as the Bankruptcy Court has ordered or may order.  Priority Non-Tax Claims are estimated at $198,221.33.

3.4    Class 2:  Secured Claims

2(a):  The secured claim of Miami-Dade County Building Department,[1] upon allowance by the court, will be paid in full in equal monthly installments over a five year period with interest accruing at 5% per annum, beginning as of the Effective Date of the Plan. This claimant will maintain its lien until this obligation is paid in full.

2(b):  The secured claim of Zions First National Bank will be paid in full in equal monthly installments over the remainder of its 25 year loan term, with interest accruing at 5% per annum, beginning as of the Effective Date of the Plan. This claimant will maintain its lien until this obligation is paid in full.

2(c):  The secured claim of Maxus Capital Group, LLC, will be paid in full in equal monthly installments over a five year period with interest accruing at 5% per annum, beginning as of the Effective Date of the Plan. This claimant will maintain its lien until this obligation is paid in full.

2(d):  The secured claim of C3 Capital Partners will be paid in full in equal monthly installments over a five year period with interest accruing at 5% per annum, beginning as of the Effective Date of the Plan. This claimant will maintain its lien until this obligation is paid in full.

2(e):  The secured claim of PPTS 1, LLC,[2] upon allowance by the court, will be paid in full in equal monthly installments over a five year period with interest accruing at 5% per annum, beginning as of the Effective Date of the Plan. This claimant will maintain its lien until this obligation is paid in full.

---

[1] This claim is disputed. An objection to this claim will be filed.
[2] This claim is disputed. An objection to this claim will be filed.

2(f): The secured claim of Banex Capital, LLC, will be paid in full in equal monthly installments over a five year period with interest accruing at 5% per annum, beginning as of the Effective Date of the Plan. This claimant will maintain its lien until this obligation is paid in full.

2(g): The secured claim of Miami-Dade County Tax Collector has been satisfied by agreement.  The scheduled claim will be disallowed in its entirety. This claim is unimpaired and not entitled to vote.

3.5    Class 3: Lease Cure Claims.

3(a): The claim to cure the defaults of the Debtor's lease with Maxus SPE, LLC, will be paid in equal monthly payments over a three year period, beginning as of the effective date of the Plan, plus 2% interest.  The principal amount of the claim is $594,140.

3(b): The claim to cure the defaults of the Debtor's leases with Dell will be paid in 25 monthly installments in an amount equal to the monthly payment provided in each of the lease agreements.  The amount of the claim is $50,941.62.

3(c): The claim to cure the defaults of the Debtor's leases with Oceanside Isles Management will be paid in 12 equal monthly installments, beginning as of the effective date of the Plan.  The principal amount of the claim is $8,164.10

3.6    Class 4:  General unsecured claims.

4(a): General unsecured claims without priority that are equal to or less than $1,000, or creditors who elect to reduce their claims to $1,000, upon allowance by the Court, shall be paid in full on the Effective Date of the Plan. The total of Class 4(a) claims is estimated at $15,252.84.

4(b): General unsecured claims that are equal to or greater than $1,001, upon allowance by the Court, shall be paid in full, in equal annual installments without interest over a 6 year period of time with the initial payment being made on the Effective Date of the Plan; provided, however, that (a) if a holder of a Class 4(b) Claim agrees in writing to accept less favorable treatment, such holder shall receive only such agreed treatment and (b) if a holder of a Class 4 Claim elects in writing on a Ballot the treatment afforded a Class 4(a) Claim and voluntarily reduces it s Claim to $1,000 or less, such Class 4(b) Claim shall be treated as a Class 4(a) Claim. The total of Class 4(b) claims is estimated to be $2,570,489.48.

3.7    Class 5:  Equity Security Holders of the Debtor: The Equity Security Holders shall retain their equity security interests in the Debtor.

## ARTICLE IV
## DESIGNATION OF IMPAIRED AND NOT IMPAIRED CLASSES

4.1     Classes 1, 2(g), and 5 are not impaired.

4.2     Classes 2(a)-(f), 3, and 4 are impaired.


## ARTICLE V
## PROVISIONS COVERING DISTRIBUTION, GENERAL PROVISIONS

5.1     The rights afforded in this Plan and the payments and distributions to be made hereunder shall be in exchange for and in complete exchange, satisfaction, discharge, and release of all existing claims of any kind, nature or description whatsoever against Debtor or any of its assets or properties; and, except as otherwise provided herein, upon the Effective Date, all existing claims against the Debtor shall be, and be deemed to be, exchanged, satisfied, discharged, and released in full; and all holders of claims shall be precluded from asserting against the Debtor or its assets or properties or successors in interest, any other or further claim based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

5.2     The distributions that are made to the various classes of creditors hereunder shall not be subject to levy, garnishment, attached, or like legal process by any creditor of a senior class by reason of claimed contractual subordination rights, so that each creditor will have, receive, and retain the sole and exclusive benefit of the distributions set forth in this Plan.

5.3     Except as otherwise provided by this Plan, upon the consummation date, title to all assets and properties dealt with by this Plan shall vest in the Debtor or its successor in interest, free and clear of all claims and the Confirmation Order shall be a discharge of Debtor's liabilities, except as provided for herein.

5.4     Debtor is authorized to make all cash payments directly or through one or more disbursing agents who shall serve without further fee.

5.5     Debtor shall retain the right to pursue and/or defend any legal action it considers necessary against creditors or other interested parties to resolve possible preference or avoidance actions and/or such other actions that the Debtor may have had standing to bring in order to maximize and safeguard the required payments to creditors, including without limitation all claims and causes of action identified or referenced in the Debtor's schedules and Statement of Financial Affairs.

5.6     Except as provided herein and subject to confirmation of the Debtor's Plan of Reorganization, the Debtor reserves the right to pursue any action against third parties, including but not limited to causes of action against creditors of the estate in state court, U.S. District Court, or appellate court against third parties, including causes related to the claims against this estate and any vendor actions that may later arise.

5.7     The Debtor reserves for itself the right to pursue to completion any objections to claims and/or other litigation pending at the time of confirmation.

5.8     The Debtor is not able to determine the viability of the potential causes of action set forth above at the current time, nor has the Debtor determined a cost benefit analysis of said actions. If the Debtor, in its sole discretion, elects to pursue any cause of action and is successful in pursuing same, any collections above the cost of the litigation, will be disbursed pro rata to Class 4 claimants.

## ARTICLE VI
## EXECUTORY CONTRACTS

6.1     Attached to this Plan as Exhibit 1 is a list of the unexpired leases and executory contracts to be assumed as obligations of the reorganized Debtor under this Plan (the "Assumed Contracts") or rejected as noted (the "Rejected Contracts").  On the Effective Date, each of the Assumed Contracts shall be assumed as obligations of the reorganized Debtor. The Order of the Court confirming the Plan shall constitute an Order approving the assumption of each Assumed Contract and the rejection of each Rejected Contract.

Any party to an Assumed Contract that objects to the assumption of its lease or contract, must file and serve an objection to the Plan within the deadline for objecting to the confirmation of the Plan as set by the Court.

The order confirming the Plan shall constitute an order approving the rejection of the lease or contract.   Any party to a Rejected Contract that objects to the rejection of its contract or lease, must file and serve an objection to the Plan within the deadline for objecting to the confirmation of the Plan as set by the Court.  The bar date for filing a proof of claim arising from the rejection of a Rejected Contract shall be set by order of the Court.  Any claim based on the rejection of a Rejected Contract will be barred if the proof of claim is not timely filed, unless the Court later orders otherwise.

## ARTICLE VII
## PROCEDURE FOR RESOLVING CONTESTED CLAIMS

7.1     Unless otherwise ordered by the Bankruptcy Court, Debtor shall litigate to judgment, settle or withdraw objections to contested claims subsequent to confirmation, if necessary.

7.2     Should any payment become due under the Plan on a contested claim, such payment shall be held in the Debtor's counsel's trust account pending the resolution of contested claim. Upon final resolution of the contested claim, the Claimant shall be paid a pro rata distribution of the funds held based on the percentage of the claim allowed, if any.

## ARTICLE VIII
## PROVISIONS FOR RETENTION OF JURISDICTION FOR SUPERVISION
## OF THE PLAN

8.1     The Bankruptcy Court shall retain jurisdiction over the Chapter 11 case for the purposes of determining any and all objections to the allowances of claims; determining any and all applications for compensation for professional and similar fees; determining any and all applications, adversary proceedings, and contested or litigated matters before the Bankruptcy Court or pending on the Confirmation Date; resolution of any tax issues through negotiation and approval of the Bankruptcy Court or by the filing of adversary complaints if deemed necessary; and construing and enforcing the provisions of the Plan relating to the payments and distributions to be made by the Debtor on or after the Confirmation Date.

8.2     Subsequent to the Confirmation Date, the Debtor is authorized and directed to take any action or cause the taking of any action necessary or appropriate to carry out the provisions of this Plan.

8.3     The headings used in this Plan are inserted for convenience only, and neither constitute a portion of the Plan nor in any manner effect the provisions of the Plan.

8.4     Should any provision in the Plan be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the Plan.

## ARTICLE IX
## PROVISION TO INVOKE CRAMDOWN PROVISION IF NECESSARY

9.1     If all of the applicable requirements of 11 U.S.C. Section 1129(a), other than paragraph 8, are found to have been met with respect to the Plan, the Debtor may then seek confirmation pursuant to 11 U.S.C. Section 1129(b).  For purposes of seeking confirmation under the cramdown provision of the Code, should that alternative means of confirmation prove to be necessary, the Debtor reserves the right to modify or vary the terms of the claims of the rejected classes, so as to comply with the requirements of 11 U.S.C. § 1129(b).

## ARTICLE X
## NOTICES

10.1     All notices required to be made in or under this Plan shall be in writing and shall be mailed by registered or certified mail return receipt requested, to PHOENIX WORLDWIDE INDUSTRIES, INC., with a copy to JEFFREY P. BAST, ESQ., Attorney for the Debtor, BAST AMRON LLP, SunTrust International Center, One Southeast Third Avenue, Suite 1440. Miami, FL 33131.

## <u>CONCLUSION</u>

The aforesaid provisions shall constitute the Plan of Reorganization of the Debtor in Possession. This Plan, when approved and confirmed by the Bankruptcy Court, shall be deemed binding on the Debtor, all creditors, and all parties in interest and their successors and assigns in accordance with Section 1141 of the Bankruptcy Code.

Respectfully submitted this _____ day of June, 2010

BAST AMRON LLP
*Counsel for Debtor in Possession*
SunTrust International Center
One Southeast Third Avenue
Suite 1440
Miami, Florida 33131
Telephone: 305.379.7904
Facsimile:  305.379.7905
Email: jbast@bastamron.com
Email: dquick@bastamron.com


By: ___*/s/ Jeffrey P. Bast*_____
    Jeffrey P. Bast, Esq. (FBN 996343)
    Dana R. Quick, Esq. (FBN 0074402)



PHOENIX WORLDWIDE INDUSTRIES, INC.



By: _____
    Name: _____
    Title: _____

**EXHIBIT 1**
**ASSUMED CONTRACTS**

1. Master Agreement No. 1364 with Maxus Capital Group, LLC,[3] dated October 22, 2007.

   a. Proposed Cure: $594,140.00 to be paid in equal monthly installments over 3 years, with 2% interest.

2. Business Lease with Oceanside Isles Management, dated October 1, 2005.

   a. Proposed Cure: $8,164.10 to be paid in equal monthly installments over 12 months.

3. Dell Equipment Leases
   - Loan No. 501-006365645-002 dated June 16, 2005
   - Loan No. 501-006365645-003 dated September 22, 2005
   - Lease No. 001-006365645-004 dated January 23, 2007
   - Lease No. 001-006365645-005 dated April 5, 2007
   - Lease No. 001-006365645-006 dated May 14, 2007
   - Lease No. 003-006365645-007 dated August 27, 2007
   - Lease No. 003-006365645-008 dated August 30, 2007
   - Lease No. 003-006365645-009 dated September 4, 2007
   - Lease No. 003-006365645-010 dated October 4, 2007
   - Lease No. 003-006365645-011 dated October 5, 2007
   - Lease No. 003-006365645-012 dated January 21, 2008
   - Lease No. 003-006365645-013 dated April 18, 2008
   - Lease No. 003-006365645-014 dated June 18, 2008
   - Lease No. 003-008850165-001 dated October 2, 2008

   a. Proposed Cure: $50,941.62 to be paid in 25 monthly installments in an amount equal to the monthly payment provided in each of the lease agreements.

---

[3] The proof of claim related to this lease agreement has been filed under the name Maxus Capital Spe I, LLC. *See* Proof of Claim #50.

# Exhibit B

# Liquidation Analysis

| Phoenix Worldwide Industries, Inc. Fixed Asset Balance Schedule | Purchase Price | Accum Depr | Balance | Current Orderly Liquidation Value |
|---|---|---|---|---|
| **140 · LAND** | | | | |
| **141025. · LAND** | 47,500.00 | | 47,500.00 | |
| **Total 140 · LAND** | 47,500.00 | 0.00 | 47,500.00 | 47,500.00 |
| | | | | |
| **141 · PROPERTY** | | | | |
| **141000. · PLANT BUILDING** | 902,500.00 | (314,525.87) | 587,974.13 | |
| **151000. · PLANT BUILDING IMPROVEMENT** | 859,311.68 | (271,160.40) | 588,151.28 | |
| **151050. · OFFICE LEASEHOLD IMPROVEMENTS** | 310.86 | (47.82) | 263.04 | |
| **Total 141 · PROPERTY** | 1,762,122.54 | (585,734.09) | 1,176,388.45 | 1,176,388.45 |
| | | | | |
| **143 · TOOLS & EQUIPMENT** | | | | |
| **143000. · PLANT FURNITURE & FIXTURES** | 335,562.57 | (327,012.82) | 8,549.75 | |
| **143050. · OFFICE FURNITURE & FIX.** | 21,799.20 | (21,799.20) | 0.00 | |
| **145000. · PLANT MACHINERY & EQUIP** | 2,941,456.92 | (2,639,419.42) | 302,037.50 | |
| **149000. · PLANT OFFICE EQUIP.** | 156,940.20 | (155,445.41) | 1,494.79 | |
| **149050. · OFFICE EQUIPMENT** | 752.53 | | 752.53 | |
| **155000. · OFFICE COMPUTER SOFTWARE** | 11,230.02 | (18,096.51) | (6,866.49) | |
| **155050. · PLANT COMPUTER SOFTWARE** | 53,330.59 | (30,071.28) | 23,259.31 | |
| **155051. · PLANT PROPRIETARY SOFTWARE** | 3,693,767.32 | (756,732.80) | 2,937,034.52 | |
| **157000. · OFFICE COMPUTER HARDWARE** | 50,434.63 | (55,984.76) | (5,550.13) | |
| **157050. · PLANT COMP. HARDWARE** | 214,268.93 | (93,054.55) | 121,214.38 | |
| **Total 143 · TOOLS & EQUIPMENT** | 7,479,542.91 | (4,097,616.75) | 3,381,926.16 | 2,200,000.00 |
| | | | | |
| **147 · PLANT VEHICLES** | | | | |
| **147000. · PLANT AUTOMOBILE/TRUCK** | 40,293.56 | (40,293.56) | 0.00 | |
| **158075. · COMPANY DEMO VEHICLES** | 1,549,104.88 | (1,373,842.47) | 175,262.41 | |
| **Total 147 · PLANT VEHICLES** | 1,589,398.44 | (1,414,136.03) | 175,262.41 | 175,000.00 |
| | | | | |
| **TOTAL** | **10,878,563.89** | **(6,097,486.87)** | **4,781,077.02** | **3,598,888.45** |

# Exhibit C1

**Phoenix Worldwide Industries, Inc., Case No. 09-23201-BKC-RAM**
*Chapter 11 Plan Payments Pro Forma*

| CLASSES | Effective Date Payments | Payment Month 1 | Payment Month 2 | Payment Month 3 | Payment Month 4 | Payment Month 5 | Payment Month 6 | Payment Month 7 | Payment Month 8 | Payment Month 9 | Payment Month 10 | Payment Month 11 | Payment Month 12 | Monthly Payment for Months 13-24 | Monthly Payment for Months 25-36 | Monthly Payment for Months 37-48 | Monthly Payment for Months 49-60 | Monthly Payment for Months 61-72 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Admin. Expenses | $ 80,000.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 80,000.00 |
| Priority Tax Claims [1] | $ - | $ 22,137.14 | $ 22,137.14 | $ 22,137.14 | $ 22,137.14 | $ 22,137.14 | $ 22,137.14 | $ 22,137.14 | $ 22,137.14 | $ 22,137.14 | $ 22,137.14 | $ 22,137.14 | $ 22,137.14 | 265,645.68 | 265,645.68 | 265,645.68 | $ - | $ - | $ 1,062,582.72 |
| Maxus Capital Spe I, LLC Lease [2] | $ - | $ 34,940.00 | $ 34,940.00 | $ 34,940.00 | $ 34,940.00 | $ 34,940.00 | $ 34,940.00 | $ 34,940.00 | $ 34,940.00 | $ 34,940.00 | $ 34,940.00 | $ 34,940.00 | $ 34,940.00 | 419,280.00 | 419,280.00 | 104,820.00 | $ - | $ - | $ 1,362,660.00 |
| CLASS I Priority Non-Tax | $ 176,321.33 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 176,321.33 |
| CLASS II(a) Miami-Dade Building Dept. | $ - | $ 967.07 | 967.07 | 967.07 | 967.07 | 967.07 | 967.07 | 967.07 | 967.07 | 967.07 | 967.07 | 967.07 | 967.07 | 11,604.84 | 11,604.84 | 11,604.84 | 11,604.84 | $ - | $ 58,024.20 |
| CLASS II(b) Zions First Nat'l Bank | $ - | $ 16,929.55 | 16,929.55 | 16,929.55 | 16,929.55 | 16,929.55 | 16,929.55 | 16,929.55 | 16,929.55 | 16,929.55 | 16,929.55 | 16,929.55 | 16,929.55 | 203,154.60 | 203,154.60 | 203,154.60 | 203,154.60 | 203,154.60 | $ 1,218,927.60 |
| CLASS II(c) Maxus Capital Group, LLC | $ - | $ 21,253.22 | 21,253.22 | 21,253.22 | 21,253.22 | 21,253.22 | 21,253.22 | 21,253.22 | 21,253.22 | 21,253.22 | 21,253.22 | 21,253.22 | 21,253.22 | 255,038.64 | 255,038.64 | 255,038.64 | 255,038.64 | $ - | $ 1,275,193.20 |
| CLASS II(d) C3 Capital Partners | $ - | $ 14,126.53 | 14,126.53 | 14,126.53 | 14,126.53 | 14,126.53 | 14,126.53 | 14,126.53 | 14,126.53 | 14,126.53 | 14,126.53 | 14,126.53 | 14,126.53 | 169,518.36 | 169,518.36 | 169,518.36 | 169,518.36 | $ - | $ 847,591.80 |
| CLASS II(e) PPTS 1, LLC | $ - | $ 612.68 | 612.68 | 612.68 | 612.68 | 612.68 | 612.68 | 612.68 | 612.68 | 612.68 | 612.68 | 612.68 | 612.68 | 7,352.16 | 7,352.16 | 7,352.16 | 7,352.16 | $ - | $ 36,760.80 |
| CLASS II(f) Banex Capital, LLC | $ - | $ 34,820.20 | 34,820.20 | 34,820.20 | 34,820.20 | 34,820.20 | 34,820.20 | 34,820.20 | 34,820.20 | 34,820.20 | 34,820.20 | 34,820.20 | 34,820.20 | 417,842.40 | 417,842.40 | 417,842.40 | 417,842.40 | $ - | $ 2,089,212.00 |
| CLASS II(g) Miami-Dade Tax Collector | $ - | $ 550.70 | 550.70 | 550.70 | 550.70 | 550.70 | 550.70 | 550.70 | 550.70 | 550.70 | 550.70 | 550.70 | 550.70 | 6,608.40 | 6,608.40 | 6,608.40 | 6,608.40 | $ - | $ 33,042.00 |
| CLASS III(a) Maxus SPE Cure | $ - | $ 17,017.70 | 17,017.70 | 17,017.70 | 17,017.70 | 17,017.70 | 17,017.70 | 17,017.70 | 17,017.70 | 17,017.70 | 17,017.70 | 17,017.70 | 17,017.70 | 204,212.40 | 204,212.40 | $ - | $ - | $ - | $ 612,637.20 |
| CLASS III(b) Dell Lease Cure | $ - | $ 2,772.72 | 2,772.72 | 2,772.72 | 2,772.72 | 2,772.72 | 2,772.72 | 2,772.72 | 2,772.72 | 2,772.72 | 2,772.72 | 2,772.72 | 2,772.72 | 17,587.88 | 81.10 | $ - | $ - | $ - | $ 50,941.62 |
| CLASS III(c) Oceanside Isles | $ - | $ 680.34 | 680.34 | 680.34 | 680.34 | 680.34 | 680.34 | 680.34 | 680.34 | 680.34 | 680.34 | 680.34 | 680.34 | $ - | $ - | $ - | $ - | $ - | $ 8,164.08 |
| CLASS IV(a) GUC's of $1,000 or less | $ 14,017.84 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 14,017.84 |
| CLASS IV(b) GUC's of $1,001 or more | $ - | $ 33,411.66 | 33,411.66 | 33,411.66 | 33,411.66 | 33,411.66 | 33,411.66 | 33,411.66 | 33,411.66 | 33,411.66 | 33,411.66 | 33,411.66 | 33,411.66 | 400,939.92 | 400,939.92 | 400,939.92 | 400,939.92 | 400,939.92 | $ 2,405,639.52 |
| Statutory US Trustees Fees | $ - | $ - | $ - | $ 4,875.00 | $ - | $ - | $ 4,875.00 | $ - | $ - | $ 4,875.00 | $ - | $ - | $ 4,875.00 | 19,500.00 | 19,500.00 | 19,500.00 | 19,500.00 | 6,500.00 | $ 104,000.00 |
| | $ 270,339.17 | $ 200,219.51 | $ 200,219.51 | $ 205,094.51 | $ 200,219.51 | $ 200,219.51 | $ 205,094.51 | $ 200,219.51 | $ 200,219.51 | $ 205,094.51 | $ 200,219.51 | $ 200,219.51 | $ 205,094.51 | 2,398,285.28 | 2,380,778.50 | 1,862,025.00 | 1,491,559.32 | 610,594.52 | $ 11,435,715.91 |

[1] Plan projections assume June 29, 2010, as the effective date. Regardless of when the Plan becomes effective, the final payment to Priority Tax Claimants will be made on or before June 29, 2015 in accordance with 11 U.S.C. 1129(a)(9)(C).

[2] Plan projections assume June 29, 2010, as the effective date. The amounts included here do no provide for cure.

[3] Plan provides for regular annual payments to Class IV creditors, however the Debtor will make monthly deposits into an escrow to be paid to creditors at year end.

# Exhibit C2

**PWI Projected Financial Statements and Statement of Operations for Year 07/01/10 to 06/30/2011 & Subsequent Years through 06/2016**

| Month BEGINNING | Jul-10 | Aug-10 | Sep-10 | Oct-10 | Nov-10 | Dec-10 | Jan-11 | Feb-11 | Mar-11 | Apr-11 | May-11 | Jun-11 | Jul-11 | Aug-11 | Sep-11 | Oct-11 | 11/2011-10/2012 | 11/2012-10/2013 | 11/2013-10/2014 | 11/2014-10/2015 | 11/2015-10/2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BEGINNING CASH** | 4,047.41 | 7,351.64 | 211,151.63 | 192,569.05 | 570,353.31 | 889,437.72 | 1,203,974.42 | 1,513,636.12 | 1,719,353.82 | 1,925,071.52 | 2,125,914.22 | 2,331,631.92 | 2,537,349.62 | 2,738,192.32 | 2,943,910.02 | 3,149,627.72 | 3,350,470.42 | 4,123,264.34 | 3,353,565.04 | 3,102,619.24 | 3,222,139.12 |
| **CASH RECEIPTS:** | | | | | | | | | | | | | | | | | | | | | |
| **SALES:** | | | | | | | | | | | | | | | | | | | | | |
| TARDEC-DCS-U. S. Army | 115,505.25 | 57,752.62 | 57,752.62 | 57,752.62 | | | | | | | | | | | | | | | | | |
| Tahsin Bayraktar Electronics Solutions Esenerji Sanayi 2 year Contract | 20,955.34 | 520,000.00 | 520,000.00 | 520,000.00 | 520,000.00 | 520,000.00 | 520,000.00 | 260,000.00 | 260,000.00 | 260,000.00 | 260,000.00 | 260,000.00 | 260,000.00 | 260,000.00 | 260,000.00 | 260,000.00 | 3,120,000.00 | 3,120,000.00 | 3,120,000.00 | 3,120,000.00 | 3,120,000.00 |
| DEA Server | 274,470.00 | 241,970.00 | 204,890.00 | | | | | | | | | | | | | | | | | | |
| DEA Smartcar | | 59,547.71 | | 59,547.71 | | | | | | | | | | | | | | | | | |
| DEA Smartcar Production | | | 104,190.81 | 104,190.81 | 104,190.81 | 104,190.81 | 104,190.81 | 104,190.81 | 104,190.81 | 104,190.81 | 104,190.81 | 104,190.81 | 104,190.81 | 104,190.81 | 104,190.81 | 104,190.81 | 1,250,289.72 | 1,250,289.72 | 1,250,289.72 | 1,250,289.72 | 1,250,289.72 |
| Prime Contract for Military Vehicle Assembly | | | 55,000.00 | 55,000.00 | 110,000.00 | 110,000.00 | 110,000.00 | 110,000.00 | 110,000.00 | 110,000.00 | 110,000.00 | 110,000.00 | 110,000.00 | 110,000.00 | | | | | | | |
| Other EnviorGuard One (2) Year Project | | | 260,000.00 | 260,000.00 | 260,000.00 | 260,000.00 | 260,000.00 | 260,000.00 | 260,000.00 | 260,000.00 | 260,000.00 | 260,000.00 | 260,000.00 | 260,000.00 | 260,000.00 | 260,000.00 | 4,680,000.00 | 3,120,000.00 | 3,120,000.00 | 3,120,000.00 | 3,120,000.00 |
| Phoenix Vehicle Leasing | | | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 120,000.00 | 120,000.00 | 120,000.00 | 120,000.00 | 120,000.00 |
| **TOTAL SALES:** | 410,930.59 | 879,270.33 | 577,752.62 | 1,107,642.62 | 1,008,738.52 | 1,004,190.81 | 1,004,190.81 | 744,190.81 | 744,190.81 | 744,190.81 | 744,190.81 | 744,190.81 | 744,190.81 | 744,190.81 | 744,190.81 | 744,190.81 | 9,170,289.72 | 7,610,289.72 | 7,610,289.72 | 7,610,289.72 | 7,610,289.72 |
| **TOTAL AVAILABLE CASH** | 414,978.00 | 886,621.97 | 788,903.65 | 1,300,211.67 | 1,579,091.83 | 1,893,628.53 | 2,208,165.23 | 2,257,826.93 | 2,463,544.63 | 2,669,262.33 | 2,870,105.03 | 3,075,822.73 | 3,281,540.43 | 3,482,383.13 | 3,688,100.83 | 3,893,818.53 | 12,520,760.14 | 11,733,554.76 | 10,963,854.76 | 10,712,908.96 | 10,832,428.84 |
| **USES OF CASH - MONTHLY EXPENSES:** | | | | | | | | | | | | | | | | | | | | | |
| **INVENTORY PURCHASES** | | | | | | | | | | | | | | | | | | | | | |
| RENT | 1,166.00 | 1,166.00 | 1,166.00 | 1,166.00 | 1,166.00 | 1,166.00 | 1,166.00 | 1,166.00 | 1,166.00 | 1,166.00 | 1,166.00 | 1,166.00 | 1,166.00 | 1,166.00 | 1,166.00 | 1,166.00 | 13,992.00 | 13,992.00 | 13,992.00 | 13,992.00 | 13,992.00 |
| FPL DEPOSIT/ELECTRIC BILL | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 54,000.00 | 54,000.00 | 54,000.00 | 54,000.00 | 54,000.00 |
| INTERMEDIA OFFSITE EMAIL | 320.00 | 320.00 | 320.00 | 320.00 | 320.00 | 320.00 | 320.00 | 320.00 | 320.00 | 320.00 | 320.00 | 320.00 | 320.00 | 320.00 | 320.00 | 320.00 | 3,840.00 | 3,840.00 | 3,840.00 | 3,840.00 | 3,840.00 |
| AT&T COMMUNICATIONS | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 300.00 | 3,600.00 | 3,600.00 | 3,600.00 | 3,600.00 | 3,600.00 |
| STS TELEPHONE + T1 LINE | 1,700.00 | 1,700.00 | 1,700.00 | 1,700.00 | 1,700.00 | 1,700.00 | 1,700.00 | 1,700.00 | 1,700.00 | 1,700.00 | 1,700.00 | 1,700.00 | 1,700.00 | 1,700.00 | 1,700.00 | 1,700.00 | 20,400.00 | 20,400.00 | 20,400.00 | 20,400.00 | 20,400.00 |
| WATER & SEWER | 502.67 | 502.67 | 502.67 | 502.67 | 502.67 | 502.67 | 502.67 | 502.67 | 502.67 | 502.67 | 502.67 | 502.67 | 502.67 | 502.67 | 502.67 | 502.67 | 6,032.04 | 6,032.04 | 6,032.04 | 6,032.04 | 6,032.04 |
| INTERSTATE WASTE SERV. | 535.00 | 535.00 | 535.00 | 535.00 | 535.00 | 535.00 | 535.00 | 535.00 | 535.00 | 535.00 | 535.00 | 535.00 | 535.00 | 535.00 | 535.00 | 535.00 | 6,420.00 | 6,420.00 | 6,420.00 | 6,420.00 | 6,420.00 |
| PITNEY BOWES | 320.00 | 320.00 | 320.00 | 320.00 | 320.00 | 320.00 | 320.00 | 320.00 | 320.00 | 320.00 | 320.00 | 320.00 | 320.00 | 320.00 | 320.00 | 320.00 | 3,840.00 | 3,840.00 | 3,840.00 | 3,840.00 | 3,840.00 |
| CIT TECHNOLOGY | 318.00 | 318.00 | 318.00 | 318.00 | 318.00 | 318.00 | 318.00 | 318.00 | 318.00 | 318.00 | 318.00 | 318.00 | 318.00 | 318.00 | 318.00 | 318.00 | 3,816.00 | 3,816.00 | 3,816.00 | 3,816.00 | 3,816.00 |
| INSURANCE | 8,728.41 | 8,728.41 | 8,728.41 | 8,728.41 | 8,728.41 | 8,728.41 | 8,728.41 | 8,728.41 | 8,728.41 | 8,728.41 | 8,728.41 | 8,728.41 | 8,728.41 | 8,728.41 | 8,728.41 | 8,728.41 | 104,740.92 | 104,740.92 | 104,740.92 | 104,740.92 | 104,740.92 |
| FCCI Insurance | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 18,000.00 | 18,000.00 | 18,000.00 | 18,000.00 | 18,000.00 |
| PAYROLL | 50,796.43 | 101,592.86 | 50,796.43 | 50,796.43 | 50,796.43 | 50,796.43 | 50,796.43 | 50,796.43 | 50,796.43 | 50,796.43 | 50,796.43 | 50,796.43 | 50,796.43 | 50,796.43 | 50,796.43 | 50,796.43 | 609,557.16 | 609,557.16 | 609,557.16 | 609,557.16 | 609,557.16 |
| Payroll Dr. Al Shuler | 10,916.00 | 21,832.00 | 10,916.00 | 10,916.00 | 10,916.00 | 10,916.00 | 10,916.00 | 10,916.00 | 10,916.00 | 10,916.00 | 10,916.00 | 10,916.00 | 10,916.00 | 10,916.00 | 10,916.00 | 10,916.00 | 130,992.00 | 130,992.00 | 130,992.00 | 130,992.00 | 130,992.00 |
| SUTA | 7,348.86 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 18,000.00 | 18,000.00 | 18,000.00 | 18,000.00 | 18,000.00 |
| PLANT SUPPLIES | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 |
| WORKMENS COMP INSURANCE | | | | | | | | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 7,200.00 | 7,200.00 | 7,200.00 | 7,200.00 | 7,200.00 |
| PLANT FACILITY MISC. | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 24,000.00 | 24,000.00 | 24,000.00 | 24,000.00 | 24,000.00 |
| MFG. RAW MATERIAL & COMPONENTS | 52,555.45 | 351,081.00 | 365,557.09 | 335,641.68 | 365,557.09 | 365,557.09 | 365,557.09 | 213,716.09 | 213,716.09 | 213,716.09 | 213,716.09 | 213,716.09 | 213,716.09 | 213,716.09 | 213,716.09 | 213,716.09 | 4,505,480.40 | 4,505,480.40 | 4,505,480.40 | 4,505,480.40 | 4,505,480.40 |
| **ADMINISTRATIVE EXPENSES:** | | | | | | | | | | | | | | | | | | | | | |
| LEGAL | 48,544.54 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 | 180,000.00 | 180,000.00 | 180,000.00 | 180,000.00 | 180,000.00 |
| BOOKKEEPING | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 42,000.00 | 42,000.00 | 42,000.00 | 42,000.00 | 42,000.00 |
| ACCOUNTANT | 6,500.00 | 3,500.00 | 6,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 42,000.00 | 42,000.00 | 42,000.00 | 42,000.00 | 42,000.00 |
| FACILITY ALARM | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 |
| KEY INSURANCE | 900.00 | 900.00 | 900.00 | 900.00 | 900.00 | 900.00 | 900.00 | 900.00 | 900.00 | 900.00 | 900.00 | 900.00 | 900.00 | 900.00 | 900.00 | 900.00 | 10,800.00 | 10,800.00 | 10,800.00 | 10,800.00 | 10,800.00 |
| MISCELLANEOUS | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 18,000.00 | 18,000.00 | 18,000.00 | 18,000.00 | 18,000.00 |
| VEHICLE EXPENSES | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 675.00 | 8,100.00 | 8,100.00 | 8,100.00 | 8,100.00 | 8,100.00 |
| Cellular Communications | 3,950.00 | 3,950.00 | 3,950.00 | 3,950.00 | 3,950.00 | 3,950.00 | 3,950.00 | 3,950.00 | 3,950.00 | 3,950.00 | 3,950.00 | 3,950.00 | 3,950.00 | 3,950.00 | 3,950.00 | 3,950.00 | 47,400.00 | 47,400.00 | 47,400.00 | 47,400.00 | 47,400.00 |
| Office Supplies | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 |
| Real Estate Taxes | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 | 30,000.00 |
| Advertising | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 24,000.00 | 24,000.00 | 24,000.00 | 24,000.00 | 24,000.00 |
| **TOTAL USES OF CASH - TOTAL:** | 218,826.36 | 536,670.94 | 492,434.60 | 459,519.19 | 489,434.60 | 489,434.60 | 489,434.60 | 338,253.60 | 338,253.60 | 338,253.60 | 338,253.60 | 338,253.60 | 338,253.60 | 338,253.60 | 338,253.60 | 338,253.60 | 5,999,210.52 | 5,999,210.52 | 5,999,210.52 | 5,999,210.52 | 5,999,210.52 |
| **ENDING CASH BALANCE:** | 196,151.64 | 349,951.03 | 296,469.05 | 840,692.48 | 1,089,657.23 | 1,404,193.93 | 1,718,730.63 | 1,919,573.33 | 2,125,291.03 | 2,331,008.73 | 2,531,851.43 | 2,737,569.13 | 2,943,286.83 | 3,144,129.53 | 3,349,847.23 | 3,555,564.93 | 6,521,549.62 | 5,734,343.54 | 4,964,644.24 | 4,713,698.44 | 4,833,218.32 |
| **ADEQUATE PROTECTION PAYMENTS** | (188,800.00) | (138,800.00) | (103,900.00) | | | | | | | | | | | | | | | | | | |
| **PAYMENTS TO SECURED AND** | | | | (270,339.17) | (200,219.51) | (200,219.51) | (205,094.51) | (200,219.51) | (200,219.51) | (205,094.51) | (200,219.51) | (200,219.51) | (205,094.51) | (200,219.51) | (200,219.51) | (205,094.51) | (2,398,285.28) | (2,380,778.50) | (1,862,025.00) | (1,491,559.32) | (610,594.52) |
| **ENDING CASH BALANCE:** | 7,351.64 | 211,151.63 | 192,569.05 | 570,353.31 | 889,437.72 | 1,203,974.42 | 1,513,636.12 | 1,719,353.82 | 1,925,071.52 | 2,125,914.22 | 2,331,631.92 | 2,537,349.62 | 2,738,192.32 | 2,943,910.02 | 3,149,627.72 | 3,350,470.42 | 4,123,264.34 | 3,353,565.04 | 3,102,619.24 | 3,222,139.12 | 4,222,623.80 |

# Exhibit D

# Summary of Claims[1]

**UNCLASSIFIED CLAIMS**

### Administrative Expenses

| | |
|---|---:|
| Unpaid fees of BALLP *(estimated)* | 80,000.00 |
| U.S. Trustee Fees *(estimated)* | 4,500.00 |
| **Total** | **84,500.00** |

### Priority Tax Claims

| | |
|---|---:|
| Miami-Dade County Tax Collector *(intangibles tax)* | 502.07 |
| IRS | 674,806.27 |
| IRS | 9,801.91 |
| Arizona Department of Revenue | 1,762.71 |
| Florida Department of Revenue *(corporate income tax)* | 300.00 |
| Florida Department of Revenue *(unemployment tax)* | 1,304.25 |
| Commonwealth of Pennsylvania | 1,119.70 |
| Pennsylvania *(unemployment tax)* | 20.25 |
| **Total** | **678,225.25** |

## CLASS 1: PRIORITY NON-TAX CLAIMS

| | |
|---|---:|
| Victor Sarduy | 2,193.70 |
| Sharath Kasba | 3,000.00 |
| Alejandro Martinez | 10,950.00 |
| Oscar Arana | 10,950.00 |
| Ted Weiss | 10,950.00 |
| Alain Martin | 10,950.00 |
| Carlos Romero | 10,950.00 |
| Dr. J. Al Esquivel Shuler | 10,950.00 |
| Haydee Leknes | 10,950.00 |
| Hortensia Martin | 10,950.00 |
| James Peterson | 10,950.00 |
| Jose Acevedo | 10,950.00 |
| Jose Martin | 10,950.00 |
| Lourdes M. Fernandez | 10,950.00 |
| Loye Matika | 10,950.00 |

---

[1] By including creditor claims on this schedule, the Debtor does not consent to the allowance, extent, validity, or priority of any claims; the Debtor expressly reserves the right to object on any basis to any and all claims, whether scheduled or filed.

| | |
|---|---:|
| Marlene Esquivel | 10,950.00 |
| Omeria Dimingo | 10,950.00 |
| Richard Urban | 6,877.63 |
| Wilmer Carcasses | 10,950.00 |
| Ivan Perez | 10,950.00 |
| **Total** | **198,221.33** |

## CLASS 2: SECURED CLAIMS

| | |
|---|---:|
| (a) Miami-Dade County Building Department | 51,245.80 |
| (b) Zions First National Bank | 2,895,970.04 |
| (c) Maxus Capital Group, LLC | 1,126,223.32 |
| (d) C3 Capital Partners | 748,574.92 |
| (e) PPTS 1, LLC | 32,466.35 |
| (f) Banex Capital, LLC | 1,845,146.81 |
| (g) Miami-Dade County Tax Collector | 29,182.10 |
| **Total** | **6,728,809.34** |

## CLASS 3: CURE CLAIMS

| | |
|---|---:|
| (a) Maxus Capital SPE, LLC | 594,140.00 |
| (b) Dell | 50,941.62 |
| **(c) Oceanside Isles Management** | **8,164.10** |
| **Total** | **653,245.72** |

## CLASS 4: GENERAL UNSECURED
### Class 4(a): General Unsecured Claims of $1,000 or Less

| | |
|---|---:|
| Interstate Screw Corp | 24.84 |
| Eureka Animal Clinic | 25.00 |
| Pitney Bowes *(equipment tax)* | 25.80 |
| GlobalStar, Inc. | 28.00 |
| Segal Gas, Inc. | 45.37 |
| Mouser Electronics, Inc. | 47.26 |
| BSFS Leasing *(personal property tax)* | 49.09 |
| Arizona Dept. of Revenue | 54.00 |
| Scientek of Miami, Inc. | 60.00 |
| TBS Recovery | 62.00 |

| | |
|---|---|
| "S" Printing | 72.06 |
| Costco Wholesale | 90.00 |
| UPS | 93.00 |
| DERM | 100.00 |
| Hortensia Martin | 108.00 |
| Electric Components and Equipment | 144.08 |
| Ivan Perez | 149.00 |
| Digi Key, Inc. | 155.72 |
| Smith Hamilton, Inc. | 170.35 |
| Alejandro Martinez | 202.38 |
| Iron Mountain | 210.00 |
| B & R Electronics, Inc. | 228.00 |
| Amerisew, Inc. | 242.85 |
| TCN, Inc. | 275.00 |
| Toshiba Copier Rental | 278.00 |
| Napa Auto Parts | 278.25 |
| IACLEA | 300.00 |
| Miami-Dade County Fire Rescue | 300.00 |
| Fla. Dept. of Revenue *(unemployment tax)* | 310.00 |
| Devcon Security | 330.00 |
| Tech Air of South Florida | 407.52 |
| FEDEX Customer Information Service | 431.59 |
| Semy Tech Inc. | 467.50 |
| Pitney Bowes | 497.00 |
| Demark Customs Brokers | 513.00 |
| Laura Brill | 545.00 |
| Truly Nolen | 560.00 |
| Abbott's Safe & Lock Company | 561.75 |
| Printer Team | 620.34 |
| JDL Industries | 654.26 |
| Viva Liz, Inc. | 661.58 |
| STE Systems | 665.00 |
| Mitchell One | 745.00 |
| Global Crossings Teleconferencing | 767.10 |
| Land and Sea | 792.67 |
| American Control Products | 905.48 |
| **Total** | **15,252.84** |

## Class 4(b): General Unsecured Claims of $1,001 or More

| | |
|---|---|
| Zephyrhills | 1,275.00 |
| Town & Country Industries, Inc. | 1,446.60 |

| | |
|---|---|
| VideoTec | 1,544.47 |
| Ted Weiss | 1,590.00 |
| STS Telecom | 1,731.00 |
| AT&T (BellSouth Communications Systems, LLC) | 1,746.07 |
| McNichols Co. | 1,867.56 |
| Mark Grossman, Esq. | 1,908.76 |
| Omeria Dimingo | 1,936.58 |
| Pro Translating | 2,275.00 |
| Miami-Dade County Water & Sewer | 2,292.33 |
| Trabada Enterprises, Inc. | 2,297.38 |
| Waste Services of Florida | 2,477.64 |
| USAA Car Insurance | 2,650.00 |
| Capital One | 2,686.81 |
| Tropical Assemblies, Inc. | 2,692.15 |
| Union Central | 2,700.00 |
| AT&T | 2,821.04 |
| Bruno Gagliani | 3,042.95 |
| NHP | 3,122.37 |
| Florida Power & Light Company | 4,065.97 |
| Jose Martin | 4,078.95 |
| Lourdes M. Fernandez | 4,348.91 |
| Ocean Bank | 4,500.00 |
| Object Video | 5,000.00 |
| Binstock, Rubin, Adler | 5,250.00 |
| CIT Technology Financing Services, Inc. | 6,188.15 |
| Deep Blue | 6,303.40 |
| Sharath Kasba | 6,679.67 |
| Expo Public Transportation | 7,000.00 |
| RBS Mastercard | 7,182.23 |
| ADT Security Services | 7,715.37 |
| Industrial Networking Solutions, Inc. | 8,012.79 |
| Hortensia Martin | 8,035.70 |
| Oceanside Isle Management *(scheduled as Inside Isles Management)* | 8,164.10 |
| M & G Battery | 8,724.00 |
| Homeland Security Administration | 8,725.00 |
| Oscar Arana | 9,051.89 |
| Marlene Esquivel | 9,628.02 |
| Netwell Noise Control | 9,896.95 |
| Zenith Insurance Company | 10,166.00 |
| Wilmer Carcasses | 11,007.40 |

| | |
|---|---:|
| DonRowe.com | 11,424.00 |
| James Peterson | 12,181.50 |
| Howard J. Schneider, CPA | 12,672.38 |
| ADT Security Services | 12,958.56 |
| CDW Corporation | 13,115.45 |
| Mango DSP, Inc. | 14,488.66 |
| Visa BMW Card | 16,092.43 |
| Miceli Brothers, Inc. | 16,860.00 |
| Mack Insurance | 22,192.72 |
| Alain Martin | 24,361.73 |
| Ted Weiss | 24,540.75 |
| Haydee Leknes | 24,791.88 |
| Berenfeld, Spritzer, Schechter, Sheer LP | 25,279.00 |
| All Star Machine | 25,748.25 |
| Ivan Perez | 25,993.65 |
| American Express Bank, FSB | 26,950.67 |
| Watec, Inc. | 28,510.65 |
| Martin & Associates, PLLC | 29,176.50 |
| Imperial A.I. Credit Companies, Inc. | 29,295.01 |
| Carlos Romero | 30,655.34 |
| Tactical Support Equipment, Inc. | 33,225.00 |
| Computing Resources, Inc. d/b/a/ Intuit Payroll Services | 33,393.59 |
| Anna Lisel Brown | 49,731.60 |
| Imperial Premium | 55,340.00 |
| Clearsite Communications | 60,321.43 |
| American Express Bank, FSB | 71,475.21 |
| O'Herron & Company | 150,000.00 |
| Loye Matika | 152,013.82 |
| IRS | 286,453.80 |
| Fowler Rodriguez Valdes-Fauli | 483,977.69 |
| EchoStorm Worldwide | 574,390.00 |
| **Total** | **2,570,489.48** |

# Exhibit E

## <u>List of Litigation Claims</u>

(i)     All avoidance actions.

(ii)    Claims against Bob Brueckmann, Thomas A. Burns, and Loye Matika for prepaid commissions.

(iii)   Claims against ARC Logistics Miami International, Inc.; the Departamento Administrativo de Seguridad, and Colvista, Ltda.

(iv)    Claims against C3 Capital Partners, L.P., and/or its replevin bond for damages to the Debtor's property during replevin.

(v)     All claims on collection of accounts receivable.

(vi)    All other litigation claims of the Debtor.

# Exhibit F

# Phoenix Worldwide Industries, Inc.
# List of Equity Security Holders

| Shareholder | Number of Shares | Percentage | Address |
|---|---|---|---|
| Dr. J. Al Esquivel Shuler & Family | 7,150,001 | 71.500 | 9955 S. W. 87th Court Miami, FL 33176 |
| Jose A. Esquivel | 438,160 | 4.382 | 6009 N. Ocean Blvd. Ocean Ridge, FL 33435 |
| Charles R. Levy | 676,000 | 6.760 | 12124 St. Andrews Place, #101 Miramar, Fl 33025 |
| Kennedy C. O'Herron | 300,000 | 3.000 | 3500 Chaucer Place Raleigh, NC 27609 |
| Thomas "Duke" Terry, Jr. | 220,000 | 2.200 | 225 Ballantyne Road Rochester, NY 14623 |
| Ajit N. Patel | 141,000 | 1.410 | 1104 Sunburst Drive Goldsboro, NC 27534 |
| CastleMark Investments, LLC | 132,000 | 1.320 | P.O. Box 27385 Boca Raton, Fl 33427 |
| James W. Pou | 124,000 | 1.240 | 3724 Knollwood Drive Durham, NC 27712 |
| Anthony R. Bocchichio | 100,000 | 1.000 | 10771 Hawks Vista Street Plantation, FL 33324 |
| Lawrence B. Fitzgerald | 100,000 | 1.000 | 1057 Serpentine Lane Pleasanton, CA 94566 |
| Brien Trayner | 51,000 | 0.510 | 3697 Locke Court Pleasanton, CA 94566 |
| James C. Branch | 50,000 | 0.500 | 3700 Computer Dr., Ste. 230 Raleigh, NC 27609 |
| Donna L. Cronheim | 50,000 | 0.500 | 208 Glenbuckley Road Cary, NC 27511 |
| Thomas Terry, III | 44,000 | 0.440 | 225 Ballantyne Road Rochester, NY 14623 |
| David Terry | 44,000 | 0.440 | 225 Ballantyne Road Rochester, NY 14623 |
| Timothy Pope | 44,000 | 0.440 | 225 Ballantyne Road Rochester, NY 14623 |
| Banex Capital, LLC | 35,000 | 0.350 | 10515 20th Street, S.E., Suite 100 Everett, WA 98205 |
| John E. Wooten III | 34,500 | 0.345 | 342 West Juniper Avenue Wake Forest, NC 27587 |
| Michael Ervin | 34,000 | 0.340 | 1512 Bridgeport Drive Raleigh, NC 27615 |
| Theodore "Ted" P. Botts | 29,000 | 0.290 | 115 East Putnam Avenue Greenwich, CT 06830 |
| Coco & Scooter LLC | 25,000 | 0.250 | 203 Chalon Drive Cary, NC 27511 |
| Mr. Patrick L. McCourt | 20,800 | 0.208 | Work Address: Barclays North, Inc. 10515 20th Street, S. E., Suite 100 Everett, WA 98205 |
| Michael Q. Karam | 20,000 | 0.200 | 900 Wakestone Court Raleigh, NC 27609 |
| C. David McKee | 18,000 | 0.180 | 900 Virginia Ave. Clarksville, VA 23927 |
| Richard K. Bazany | 18,000 | 0.180 | 14012 132nd Avenue Grand Haven, MI 49417 |
| Phillip Alan Cockman | 12,500 | 0.125 | 2512 Argonne Blvd. Greensboro, NC 27407 |

# Phoenix Worldwide Industries, Inc.
## List of Equity Security Holders

| | | | |
|---|---|---|---|
| Allen R. Barrow III | 10,500 | 0.105 | 717 Presnell Court<br>Raleigh, NC 27615 |
| Daniel Galvin | 10,000 | 0.100 | 148 Prestonian Place<br>Morrisville, NC 27560 |
| John Cardillo | 10,000 | 0.100 | 108 Crystlewood Court<br>Morrisville, NC 27560 |
| Andrew G. Pomeroy IRA | 10,000 | 0.100 | 102 Calle de Ano<br>Green Valley, AZ 85614 |
| Barbara Ward | 8,800 | 0.088 | 21218 St. Andrews Blvd. #707<br>Boca Raton, Fl 33433 |
| Kathleen D. Cronk | 6,000 | 0.060 | 8500 Bannister Ct.<br>Raleigh, NC 27615 |
| James T. Green Insurance Agency | 5,000 | 0.050 | 800-103 Salem Woods Drive<br>Raleigh, NC 27615 |
| Marshall L. Beach, IRA | 3,600 | 0.036 | 406 White Columns Way<br>Wilmington, NC 28411 |
| Jeffrey P. Fike | 3,100 | 0.031 | 130 Callan Park Lane<br>Cary, NC 27511 |
| James J. Torok | 3,000 | 0.030 | 900 Orchid Pt. Way<br>Vero Beach, Fl 32963 |
| Eileen Fike | 2,500 | 0.025 | 215 Lochside Dr.<br>Cary, NC 27511 |
| George Schwelling | 2,064 | 0.021 | 1716 Leighton Wood Lane<br>Silver Spring, MD 20910 |
| Daniel M. Whalen | 2,000 | 0.020 | 103 Hedge Nettle Crossing<br>Savannah, GA 31406 |
| Marshall L & Norma Beach | 1,000 | 0.010 | 406 White Columns Way<br>Wilmington, NC 28411 |
| Carolyn H. Odham | 1,000 | 0.010 | 13021 Falls of Neuse Rd.<br>Wake Forest, NC 27587 |
| L. Charles Rice | 1,000 | 0.010 | 1500 Chalks Rd.<br>Wake Forest, NC 27587 |
| Jane T. Keith | 1,000 | 0.010 | 406 Belmellen Cr.<br>Wake Forest, NC 27587 |
| Jack R. Albright, Jr. | 1,000 | 0.010 | 4622 Donovan St.<br>Orlando, Fl 32808 |
| Lewis A. Levy, M.D. | 1,000 | 0.010 | 100 Arnold Ct.<br>East Rockaway, NY 11518 |
| David and Marsha Russo | 1,000 | 0.010 | 106 Kinross Court<br>Durham, NC 27712 |
| John M. Kennedy | 1,000 | 0.010 | 103 Ashley Court<br>Pittsburgh, PA 15221 |
| Severin A. and Sharon H. Russo | 1,000 | 0.010 | 4 Wood Spur<br>Leetsdale, PA 15056 |
| Frank and Mary Tavella | 1,000 | 0.010 | 2365 West Gate Drive<br>Pittsburgh, PA 15237 |
| Graham Montigny | 1,000 | 0.010 | 6456 Havens Road<br>Blacklick, Ohio 43004 |
| Capital Vencap LLC c/o McKee Asset Strategies | 400 | 0.004 | 1815 Kildaire Farm Rd<br>Cary, NC 27511-6562 |
| Charles D. Clark and Debra S. Clark | 400 | 0.004 | 545 Deer Tail Lane<br>Fuquay-Varina, NC 27526 |
| White Marlin Investments, Ltd. c/o Dennis T. L. Gordon | 207 | 0.002 | 11315 Overbrook Lane,<br>Houston, TX 77077 |
| Sterling S. Lee | 154 | 0.002 | 9005 Bridgewood Trail<br>Austin, TX 78729-3638 |

# Phoenix Worldwide Industries, Inc.
# List of Equity Security Holders

| | | | |
|---|---|---|---|
| Kathia I. Santiago | 154 | 0.002 | 1521 Alton Road, #202<br>Miami Beach, Fl 33139 |
| David Clark | 100 | 0.001 | 17506 E. 46th Street<br>Tulsa, OK 74134 |
| Michael Clark | 20 | 0.000 | C/O Debra Clark<br>545 Deer Tail Lane<br>Fuquay-Varina, NC 27526 |
| Gidget S. Wilson | 20 | 0.000 | 7013 Moonlit Dr.<br>Holly Springs, NC 27540 |
| Serene H. Carpenter | 20 | 0.000 | 545 Deer Tail Lane<br>Fuquay-Varina, NC 27526 |
| **Total Shares** | **10,000,000** | **100.000** | |

# Exhibit G

№21252

## FRANCHISE CONTRACT

**TAHSIN BAYRAKTAR ELEKTRONIK SISTEMLERİ** (hereinafter referred to as **TBS**) at "Gayrettepe Mah. Barbaros Bulvarı Pınar Apt. No:163 Kat:3 D:6 Balmumcu / Beşiktaş / Istanbul" on one hand, and **ESENERJİ SANAYİ TİCARET VE İNŞAAT LİMİTED ŞİRKETİ** (hereinafter referred to as the **AGENT**) at "Ayazağa Cendere Cad. No: 25 Şişli / Istanbul" on the other hand agree under the following terms and conditions.

The addresses first written above are the addresses of the parties for notices respectively, and any notices given to such addresses shall be deemed to have been given to the parties respectively unless any party is informed by the other party in writing of any change in address.

## 1.    SUBJECT MATTER

The subject matter of this Contract is to appoint the AGENT as the Turkish Agent for "EnviorGuard" heat isolation, paint and lining products ("**Products**") of Phoenix Worldwide Industries Inc ("Phoenix"), United States of America listed in Annex 1 for which TBS is Turkish distributor and exclusive seller. The parties shall update ANNEX 1 as and when required.

## 2.    OBLIGATIONS OF THE AGENT

2.1.    The AGENT is responsible for marketing, selling and/or applying the products imported and sold to the AGENT by TBS. The AGENT shall receive the products at the customs administrations to be agreed upon by the parties. The AGENT agrees and declares that it shall be responsible for transporting and storing the products received, and for any defects in such products after receipt as well as any damages to be caused to third parties; in cases where the manufacturer is required to be responsible, TBS is responsible. The AGENT is responsible for delivering the products to the end user pursuant to the provisions of this Contract.

2.2.    The annual quota which the AGENT is obliged to sell is 250.000 sqm for the first year. The order is deemed to have been included in the quota for the respective year as soon as it becomes binding pursuant to article 5.1. the quota to be applicable for the following years shall be determined pursuant to the provisions of article 11 of this Contract.

2.3.    The AGENT is obliged to make the signage and "authorized seller" certificate bearing the EnviorGuard logo available at its premises.

2.4.    The AGENT is obliged to settle all suspending amounts in the current account due to TBS by the end of the year.

2.5.    The AGENT shall operate its business within Turkish territory. Any sales and activities to be implemented outside Turkey are subject to prior written approval of TBS.

This translation was made by me duly true and correct.
**M** Tansel Karademir
21/06/2010

1

№21252

2.6.     The AGENT may appoint subagents upon prior written approval of TBS. In such a case, the AGENT shall inform TBS of the details of such subagent and inform the subagent of the quality requirements of TBS in writing.

2.7.     Unless TBS expressly gives consent in writing, the AGENT may not provide any guarantee or assume any undertaking on behalf of TBS, other than general guarantees.

2.8.     The AGENT shall arrange for a Show-Room requiring a cost to a reasonable extent as approved by TBS. If the AGENT engages in advertising activities although it is not responsible for, it shall obtain TBS's prior written consent for the contents of printed materials such as catalogues, brochures, etc. as well as all printed and visual advertisement.

2.9.     The Parties may not produce, purchase, sell or distribute products of other brands equivalent to the products hereunder. The Parties may not engage in activities that may lead to direct or indirect competition against each other regarding products hereunder and their equivalent.

2.10.    The AGENT shall never contact Phoenix Worldwide Industries Inc through fax, e-mail, etc.

2.11.    The AGENT may refuse to accept the products in case they do not match the quantity, standard and quality specified in the order form and/or they are delivered late. However, receipt of products which have been delivered late, or are missing or defective does not mean acceptance of products. The AGENT shall check the products for defects and quantity, and the provisions of the Law on Obligations and Turkish Commercial Code shall apply in case of nonconformity with the order form or late delivery.

2.12.    The AGENT may return to TBS the products returned by its customers or in case they do not match the standard and quality specified in the order form and Annex thereto. The AGENT hereby agrees and undertakes to sell the products hereunder in such a manner as to maintain the quality and standards of these products and to ensure customer satisfaction to a maximum extent possible regarding maintenance of quality and standards.

## 3.     OBLIGATIONS OF TBS

3.1.     TBS agrees to supply the Products through import. The events of force majeur are subject to Article 12 of this Contract.

3.2.     TBS shall provide the AGENT, upon AGENT's request, with free of charge sufficient technical information to satisfy the customer, for the purpose of supporting the AGENT in selling the products hereunder to ensure customer satisfaction.

3.3.     TBS may inspect the sales and product applications made or caused to be made by the AGENT, check the work performed for compliance with its title and/or prestige,

This translation was made by me duly true and correct
M Tansel Karadeniz
21/06/2010

2

№21252

and warn the AGENT to take necessary measures in cases where the customer satisfaction would be adversely affected.

3.4.    TBS shall provide the AGENT with sales and technical service training within at times and under conditions to be agreed upon by the parties.

3.5.    TBS may contribute promotional and/or advertising activities within the AGENT's territory in cases where required.

3.6.    In case the AGENT's customers return products containing hidden defects which could not be identified by the AGENT but appear by use of product, the AGENT shall return the same to TBS and record their price in the current account as receivable.

3.7.    The products which have been found to be defective before delivery may be returned by the AGENT. TBS is obliged to indemnify the AGENT for any and all direct or indirect demonstrable damages suffered by the AGENT pursuant to the Law on Obligations and Turkish Commercial Code, including indemnity claims raised by the customers against the AGENT for defective products. The same also applies to late and missing delivery.

## 4.    PRICE OF PRODUCTS

4.1.    TBS and AGENT shall meet quarterly to enter into a protocol for price change in order to determine the sales prices of the products hereunder as the purchase prices of the products imported by TBS change every quarter. TBS shall reflect the changes in prices of purchase of products hereunder from Phoenix to the AGENT at the same rates. However, any price changes notified after placement of order shall not be reflected to the AGENT.

4.2.    In case TBS losses its customers since the sales prices of products applied by the AGENT are at a level that would cause TBS to loss its customer community or AGENT sells the products at a price much higher than the market price of the products of the same quality as the products hereunder, the AGENT agrees and undertakes to indemnify TBS for the damages suffered by TBS due to such failure of the AGENT. However, this provision shall not apply if the AGENT is obliged to sell the products at a price much higher than the market price of the products of the same quality as the products hereunder due to the sales prices applied by TBS to the AGENT.

4.3. TBS agrees and undertakes to apply the same price list to every agent. This provision shall also apply to the price lists which shall start on 1st of January of every year and change every quarter.

## 5.    ORDER, PAYMENT AND DELIVERY

5.1.    The AGENT shall send the orders forwarded to the AGENT to TBS in the same day by e-mail or fax. The AGENT shall inform TBS by phone of transmission of

This translation was made by me duly true and correct. As Tansel Karademir
- 21/06/2010

3

№21252

order form, and TBS shall approve the order form by signing and dating and fax it back to the AGENT. The order form shall become binding upon completion of this procedure. The orders shall be placed in accordance with the order form of TBS attached hereto.

5.2.    All list prices are nationalized Istanbul Customs delivery prices to be fixed under a protocol. TBS, may undertake to pay the costs of some orders where required.

5.3.    The AGENT pay 70% + VAT (VAT of total amount of order) of total amount of order to TBS in advance within latest three workdays following the order form having been faxed back by TBS. TBS is responsible for completing all import and customs procedures, and pay all taxes, fees and other expenses. The AGENT shall pay the remaining amount (30% of total amount of order) to TBS in advance within the workday following the notice by TBS to the AGENT that the products ordered are ready for delivery at the customs upon conclusion that the products at the customs are ready for delivery without any defect and in quantities and at quality and standards in accordance with the order form. TBS reserves the right not to deliver the products in case the AGENT fails to pay the remaining amount.

The provisions of this article may be reviewed and a different payment schedule may be proposed in special cases.

5.4.    TBS shall initiate the procedures required for import of the products on the day of prepayment by the AGENT, and inform the AGENT in writing on the same or following day that the order has been received by Phoenix. TBS shall inform the AGENT of the date of approval and date of loading immediately after receipt by TBS of the approval of the order by Phoenix.

5.5.    TBS is obliged to ensure in any way that the products are ready for delivery at the customs within latest 45 workdays following prepayment in an amount of 70% + VAT. However, since the products hereunder are imported from United States of America, the public holidays applicable in United States of America shall be added to such delivery period. TBS shall take reasonable care in experiencing the 3-day period for placing order to avoid any delay in delivery of the order.

## 6.    OWNERSHIP AND DAMAGE RISK

6.1.    The ownership of all products purchased by the AGENT is transferred to the AGENT as from the delivery of the goods. It is the responsibility of the AGENT that the ordered products are taken over on the business day following the date of notification by TBS, provided that the products are available for delivery at the customs in the form and time pursuant to the contract and order form without any defect. The AGENT is responsible for not taking over the products, failing to take over the products in due time and for the damages and losses that might occur during transfer after taking over.

## 7.    THE RIGHT OF TBS TO ASSIGN AGENCIES AND TO MAKE SALES

This translation was made by me duly true and correct.
M Tansel Karademir
21/06/2010

4

№21252

7.1. TBS may assign third parties and companies as AGENCIES, open its own AGENCIES and carry out advertisement and promotional activities in relation to the products subject to the contract.

## 8. WARRANTIES

8.1. The AGENT shall fully comply with all laws and regulations regarding the storage conditions and preservation in accordance with environmental arrangements, and transportation of the product. In the event that TBS incurs any damages due to the default of the AGENT, the AGENT is liable to indemnify the damages of TBS in accordance with the provisions of the Code of Liabilities and Turkish Commercial Code.

8.2. TBS shall fully comply with all laws and regulations regarding product warranties. In the event that the AGENT incurs any damage due to the contradiction of TBS to this provision, TBS is liable to indemnify the damages of the AGENT in accordance with the provisions of the Code of Liabilities and Turkish Commercial Code.

## 9. CONFIDENTIALITY

9.1. The parties mutually agree that the commercial secrets should be protected. Such commercial secrets are including but not limited to the list of customers that the AGENT AND TBS have entered into a preliminary agreement or agreement with, technical know-how, design, price lists, tools and equipment, plans and all other information and documents.

9.2. Both Parties agree not to initiate ant contact with the real or corporate persons that the other Party supplies products on project basis, has reached an agreement or has a proven agreement. However, in case of request by such persons, they may supply products upon prior written consent of the other Party.

9.3. During the contractual period and without limitation with a 1-year period after the expiry of the contract, the Parties shall not direct the personnel of each other –for employment on their behalf or for others- to terminate their existing oral or written contracts with the other Party or to cease any other type of connection.

9.4. The Parties shall ensure that their employees are also bound with and act to these confidentiality provisions.

## 10. MISCELLANEOUS

10.1. The AGENT may not transfer its rights arising out of this contract. In case the control of TBS directly or indirectly changes hands, TBS undertakes to maintain the effectiveness of the contract.

10.2. In case any party acts in contradiction to the contract, the other party shall grant in writing a grace period of 15 days for the correction of such contradiction, and may

This translation was made by me duly true and correct.
M. Tansel Karademir

21/06/2010

5

№ 21252

21 HAZ 2010

notify that they shall unilaterally terminate the contract without indemnity unless the contradiction is corrected.

10.3.    The AGENT is responsible for the consumer damages that might arise out of the application of the products subject to the contract

## 11.    VALIDITY AND TERMINATION OF THE CONTRACT

11.1.    The validity of the contract is 1 (one) year from the date of its execution.

11.2.    The parties are entitled to terminate the contract without indemnity and without justification at the end of the period of 1 year indicated in article 11.1, provided that they make a written notification 1 month in advance. Unless the contract is terminated under this provision, it is automatically extended for one more year with the same conditions except the quota amount. In the event that the contract is extended in this manner although the purchase volume is not reached, the balance quota of the previous year may be transferred to the quota of the following year upon the initiative of TBS. The amount of quota to be effective for the following year shall be decided upon by the parties within 1 month prior to the expiry of the contract duration and no increase or discount out of the amount reasonable for the market conditions shall be applied.

11.3.    Even if the contract is terminated or expires as a result of contradiction to the contract or the cases set forth in this article, TBS undertakes to supply the products to the customers that the AGENT has concluded a preliminary contract with before the date of termination or expiry.

## 12.    FORCE MAJEUR

12.1.    Events of force major are those such as war, earthquake, flood, fire, heavy snowfall and those that render it impossible for the parties to fulfill the contract out of their control. In case of realization of such an event, the relevant party should prove it to the other party as soon as practical and within a reasonable period of time, along with the letter of certification of the respective chamber of commerce or a court decision.

## 13.    JURISDICTION

Istanbul courts and Enforcement Offices are authorized for the settlement of disputes that might arise out of the enforcement of the contract.

## 14.    NOTICES

Except for the special circumstances specified in the Turkish Commercial Code, notices shall be served through e-mail and fax. In case of any change in the above addresses, the new address shall be forthwith notified to the other party. In case the new address is not notified, the notice shall be deemed to have been served even if the relevant party is not present in the contractual address.

This translation was made by me duly true and correct.
M Tansel Karademir
21/06/2010

6

No 21252

## 15. FEES

All sorts of duties, charges and other legal liabilities that might arise in connection herewith shall be paid equally by the Parties.

This contract was executed in two copies on        /        /2010.

**TBS**                                                    **AGENT**

ANNEX 1: 3-Month Price List and Protocol
ANNEX 2: Order Forms

This translation was made
by me duly true and correct.
M  Tansel Karademir

21/06/2010

7



## BAYİLİK SÖZLEŞMESİ

Bir tarafta "Gayrettepe Mah. Barbaros Bulvarı Pınar Apt. No:163 Kat:3 D:6 Balmumcu/Beşiktaş/İstanbul" adresinde faaliyet gösteren **TAHSİN BAYRAKTAR ELEKTRONİK SİSTEMLERİ** (Bundan sonra TBS olarak anılacaktır) ile; diğer tarafta "Ayazağa Cendere Cad. No: 25 Şişli/İstanbul" adresinde faaliyet gösteren **ESENERJİ SANAYİ TİCARET VE İNŞAAT LİMİTED ŞİRKETİ** (Bundan sonra **BAYİ** olarak anılacaktır) aşağıdaki şartlarda anlaşmışlardır.

Yukarıda yazılı adresler tarafların tebligat adresleri olup; değişikliği karşı tarafa yazılı olarak bildirilmediği sürece, bu adreslere yapılacak tebligat, taraflara yapılmış sayılacaktır.

### 1.    KONU

Sözleşmenin konusu; TBS'nin Türkiye distribütörü ve tek satıcısı olduğu, Amerika Birleşik Devletleri'nde yerleşik Phoenix Worldwide Industries Inc ("Phoenix")'in Ek 1'de listelenmiş olan"EnviorGuard" ısı yalıtım boya ve astar ürünleri ("Ürünler")'in BAYİ'ye , Türkiye genelinde Bayiliğinin verilmesidir. Taraflar EK1'i gerektikçe güncelleyeceklerdir.

### 2.    BAYİ'NİN YÜKÜMLÜKLERİ

2.1.    BAYİ, TBS'nin ithal ederek BAYİ'ye sattığı ürünleri, pazarlayıp satmakla ve/veya uygulamakla yükümlüdür. BAYİ ürünleri taraflarca belirlenecek gümrükten alacaktır. Teslim alınan malların taşınmasından ve depolanmasından BAYİ ürünlerin teslim alınmasından sonra kusuru ile üçüncü kişilere verilecek zararlar dolayısıyla doğrudan sorumlu olduğunu kabul ve beyan eder; üreticinin sorumluluğunu gerektiren durumlarda TBS sorumludur. Ürünlerin işbu Sözleşme hükümleri çerçevesinde son kullanıcıya teslim edilmesi BAYİ'nin sorumluluğundadır.

2.2.    BAYİ'nin satmakla yükümlü olduğu yıllık kota ilk yıl için 250.000 metrekaredir. Sipariş, madde 5.1 uyarınca bağlayıcı olduğu andan itibaren, o yılın kotasına sayılır. Sonraki yıllar için geçerli olacak yıllık kota bu Sözleşmenin m.11 hükmüne göre belirlenecektir.

2.3.    BAYİ'nin işyerinde, EnviorGuard logolu tabela ve "yetkili satıcı" belgesinin bulundurulması şarttır..

2.4.    BAYİ, yıl sonunda TBS ile arasındaki cari hesaptaki tüm borç bakiyesini kapatmak zorundadır.

2.5.    BAYİ, ticari faaliyetlerini Türkiye ile sınırlı olarak sürdürecektir. Türkiye dışında yapılması gereken satış ve faaliyetler, TBS'nin önceden verilmiş yazılı onayına bağlıdır.

1

№21252

2.6.    BAYİ, TBS'nin önceden verilmiş yazılı iznini almak şartıyla, alt bayilikler verebilir.  Bu halde, BAYİ TBS'ye, alt bayinin bilgilerini yazılı olarak bildirecek ve TBS'nin kalite şartlarını alt bayiye yazılı olarak iletecektir.

2.7.    TBS açıkça yazılı izin vermedikçe, BAYİ, genel garantiler dışında TBS adına herhangi bir garanti veremez ve herhangi bir taahhütte bulunamaz.

2.8.    BAYİ, TBS'nin onayladığı şekilde makul ölçülerde masraf gerektiren bir Show-Room düzenleyecektir. BAYİ, yükümlü olmamasına rağmen reklam faaliyetinde bulunursa, ürünlerin tanıtımı ile ilgili olarak, katalog, broşür vs. her türlü yazılı doküman  ile her türlü yazılı ve görsel reklam içeriği için, TBS'nin önceden verilmiş iznini alacaktır.

2.9.    Sözleşme konusu ürünlere muadil başka marka ürünlerin üretimini, alım satımını veya dağıtımını yapamaz.  Taraflar işbu Sözleşme'de yer alan ürünler ve muadil ürünler ile ilgili olarak birbirleriyle doğrudan ya da dolaylı olarak rekabete sebep olacak hiçbir faaliyette bulunamaz.

2.10.   BAYİ tarafından, Phoenix Worldwide Industries Inc ile, faks, e-mail vs. hiçbir şekilde irtibat kurulmayacaktır.

2.11.   BAYİ malların sipariş formundaki miktar, standart ve kaliteye uygun olmamaları ve/veya geç teslimleri halinde malları kabul etmeyebilir.  Ancak zamanında teslim edilmeyen, eksik ve ayıplı malların teslim alınması  malların kabulü değildir. BAYİ ayıp ve miktar incelemesi yapacak ve sipariş formuna aykırılık veya geç teslim durumunda Borçlar Kanunu ile Türk Ticaret Kanunu hükümleri uygulanacaktır.

2.12.   BAYİ, müşterilerin iade ettiği malları TBS'ye ürünlerin sipariş formu ve Ek'inde belirtilen standart ve kaliteye sahip olmaması halinde iade edebilir.  BAYİ, işbu Sözleşme ile, Sözleşme konusu ürünleri, bu ürünlerin kalite ve standartlarını koruyacak şekilde satış yapmayı ve kalite ve standartların korunması bağlamında müşteri memnuniyetini mümkün olan en yüksek derecede sağlamayı kabul ve taahhüt eder. .

## 3.    TBS'NİN YÜKÜMLÜLÜKLERİ

3.1.    TBS, Ürünler'i ithalat yoluyla tedarik etmeyi kabul etmektedir. Force major durumları bu sözleşmedeki m.12'ye tabidir.

3.2.    TBS, BAYİ'ye sözleşme konusu ürünlerin satışının desteklenmesi amacı ile, müşteri memnuniyetini sağlayacak şekilde, ücretsiz olarak BAYİ'nin talebi halinde müşteriyi tatmin edecek yeterli teknik bilgiyi verecektir.

3.3.    TBS, BAYİ'nin satış ve yaptığı veya yaptırdığı ürün tatbikatlarını kontrol eder, yapılan işin adına ve/veya prestijine uygunluğunu inceler, müşteri memnuniyetini

№21252

olumsuz etkileyecek durumlarda gereken önlemlerin alınması için ikazlarda bulunabilir.

3.4.    TBS taraflarca kararlaştırılacak uygun zaman ve koşullar içinde BAYİ'ye satış ve teknik servis eğitimi verecektir.

3.5.    TBS gerekli hal ve koşullarda, BAYİ'nin bölgesinde reklam ve/veya tanıtım faaliyetlerine katkıda bulunabilir.

3.6.    BAYİ, kendisi tarafından tespit edilemeyip kullanım ile ortaya çıkan gizli ayıplı malları müşteri iade ettiği takdirde TBS'ye iade eder ve değerlerini cari hesabına alacak yazar.

3.7.    Teslim öncesinde ayıplı olduğu tespit edilen mallar BAYİ tarafından iade edilebilir. Ayıplı mallar dolayısıyla müşterilerin BAYİ'ye yöneltiği tazminat talepleri dahil BAYİ'nin uğradığı doğrudan ve dolaylı ispat edilebilir her türlü zararı TBS, Borçlar Kanunu ve Türk Ticaret kanunu hükümleri çerçevesinde tazmin etmekle yükümlüdür. Aynı hüküm geç ve eksik teslimat halinde de uygulanır.

## 4.    ÜRÜNLERİN FİYATI

4.1.    TBS'nin yurt dışından sağladığı ürünün alış fiyatlarında her üç ayda bir değişiklik olması nedeni ile, işbu Sözleşme'ye konu ürünlerin BAYİ'ye satış fiyatının belirlenmesi için TBS ve BAYİ her 3 ayda bir biraraya gelerek fiyat değişikliğine ilişkin bir protokol imzalayacaklardır. TBS Sözleşme konusu malları Phoenix'ten alım fiyatındaki değişiklikleri fiyat artış ve düşüş oranında BAYİ'ye yansıtacaktır. Ancak siparişin verilmesinden sonra bildirilmiş fiyat değişiklikleri BAYİ'ye intikal ettirilmeyecektir.

4.2.    BAYİ'nin ürünlerin satış fiyatının TBS'nin müşteri çevresini kaybedecek düzeyde olması ya da ürünlerin fiyatını söz konusu ürünlerle aynı kalitedeki ürünlerin piyasa fiyatının çok üzerinde bir fiyatla satması nedeniyle TBS'nin müşterilerini kaybetmesi halinde BAYİ TBS'nin zararlarını tazmin etmeyi kabul ve taahhüt eder. Ancak BAYİ ürünleri TBS'nin kendisine uyguladığı satış fiyatı dolayısıyla piyasadaki aynı kalitedeki ürünlerden çok daha yüksek fiyatla satmak mecburiyetinde kalıyorsa bu hüküm uygulanmayacaktır.

4.3. TBS her bayiye uygulayacağı fiyat listesinin aynı olacağını kabul ve taahhüt eder. Bu hüküm her yılın 1 Ocak gününden başlayacak ve her 3 ayda bir değişecek olan fiyat listelerinde de uygulanacaktır.

## 5.    SİPARİŞ, ÖDEME VE TESLİM

3



5.1.   BAYİ kendisine yöneltilen siparişleri aynı gün içerisinde TBS'ye e-mail ya da faks yolu ile gönderecektir. BAYİ sipariş formunun TBS'ye gönderdiğini telefon ile bildirecek, TBS sipariş formunu imza ve tarih yazarak onaylayacak ve BAYİ'ye geri fakslayacaktır. Sipariş formu işbu prosedürlerin tamamlanması ile bağlayıcı hale gelecektir.. Siparişler, TBS'nin ekte yer alan sipariş formuna uygun olarak verilecektir.

5.2.   Tüm liste fiyatları, protokolle belirlenecek millileştirilmiş İstanbul gümrük teslim fiyatıdır. TBS, gerekli gördüğü taktirde, bazı siparişlerin nakliye bedellerini üstlenebilir.

5.3.   BAYİ, toplam sipariş tutarının %70+KDV kısmını (toplam sipariş tutarının KDV'sini), sipariş formunun TBS tarafından geri fakslanmasından itibaren en geç üç iş günü içinde, TBS'ye peşin olarak ödeyecektir. TBS her türlü ithalat ve gümrük işlemlerini yapmak, her türlü vergi, harç ve sair masrafı ödemekle sorumludur. Sipariş edilen malların gümrükten teslime hazır hale geldiğinin TBS tarafından BAYİ'ye bildirimini takip eden iş günü içinde de, gümrükte malların sipariş formuna uygun miktar kalite ve standartlarda ayıpsız olarak teslime hazır olduğunun tespiti üzerine bakiye bedel (toplam sipariş bedelinin %30'u) TBS'ye peşin olarak ödenecektir.. TBS, BAYİ'nin bakiye ödemeyi yapmaması durumunda, malı teslim etmeme hakkını kendinde saklı tutar.

Özel durumlar için bu madde hükümleri tekrar gözden geçirilerek farklı bir ödeme planı öngörülebilir.

5.4.   BAYİ'nin peşin ödemeyi yaptığı gün TBS malın ithal edilmesi için gerekli işlemlere başlayacak, aynı gün veya en geç izleyen gün BAYİ'ye, Pheonix'e siparişi ulaştırdığına dair yazılı bilgi verecektir. TBS, siparişin Phoenix tarafından kabul edildiğini gösteren evrakın kendisine ulaşmasından itibaren derhal kabul etme tarihi ve yükleme tarihini BAYİ'ye bildirecektir.

5.5.   TBS her halükarda %70+ KDV tutarındaki peşin ödemenin yapıldığı tarihten itibaren en geç 45 iş günü içinde gümrükte BAYİ'ye teslime hazır olmasını sağlamakla yükümlüdür.  Ancak, Sözleşme'ye konu malların Amerika Birleşik Devletleri'nden gelmesi nedeni ile, işbu teslim süresine Amerika Birleşik Devletleri'nde uygulanan resmi tatil süreleri eklenecektir. TBS bu resmî tatil günlerini dikkate alarak m. 5.3.'teki 3 günlük sipariş verme süresini kullanırken siparişin gelmesini geciktirmemek için gerekli özeni gösterecektir.

## 6.   MÜLKİYET ve ZARAR RİSKİ

6.1.   BAYİ'nin satın aldığı tüm ürünlerin mülkiyeti malın tesliminden itibaren BAYİ'ye geçer. Sipariş edilen malların sözleşmeye ve sipariş formuna uygun şekilde ve zamanında, ayıpsız olarak gümrükte hazır olması şartıyla TBS'nin bildirim yaptığı günü izleyen işgünü teslim alınması BAYİ'nin sorumluluğundadır. BAYİ'nin malları



hiç teslim almaması, zamanında teslim almaması veya malları teslim aldıktan sonraki sevk esnasında doğabilecek zarar ve ziyandan BAYİ sorumludur.

## 7.    TBS' NİN BAYİLİK VERME VE SATIŞ HAKKI

7.1. TBS, sözleşme konusu ürünlerle ilgili olarak, başka 3. şahıs ve şirketlere de BAYİlik verebilir kendi BAYİliklerini açabilir reklam ve tanıtım faaliyetlerinde bulunabilir.

## 8.    GARANTİLER

8.1.    BAYİ, urunun depolanma koşulları ve cevre düzenlemeleri doğrultusunda muhafaza edilmesi ve nakliyesi ile ilgili bütün kanun ve yönetmeliklere tam olarak uyacaktır. TBS'nin BAYİ'nin kusuru dolayısı ile herhangi bir zarara uğraması durumunda, BAYİ, TBS'nin zararlarını Borçlar Kanunu ve Türk Ticaret Kanunundaki hükümler uyarınca tazmin etmekle yükümlüdür. .

8.2.    TBS, ürün garantileri ile ilgili bütün kanun ve yönetmeliklere tam olarak uyacaktır. BAYİ'nin TBS'nin bu hükme aykırılık nedeniyle herhangi bir zarara uğraması durumunda, TBS BAYİ'nin zararlarını Borçlar Kanunu ve Türk Ticaret Kanunundaki hükümler uyarınca tazmin etmekle yükümlüdür.

## 9.    GİZLİLİK

9.1.    Taraflar karşılıklı olarak ticarî sırların korunması gerektiğini kabul ederler. Bu ticarî sırlar bunlarla sınırlı olmamak şartıyla BAYİ'NİN VE TBS'nin önanlaşma veya anlaşmaya vardığı müşterilerin listesi, teknik know-how, design, fiyat listesi, alet ve ekipman, plan ve diğer bilgi ve belgeler bütünüdür.

9.2.    Taraflar'dan hiçbiri diğer Taraf'ın proje bazında mal sağladığı, mutabakata vardığı veya mutabakatı kanıtladığı gerçek veya tüzel kişilerle temas başlatmamayı kabul ederler. Ancak bu kişilerin talebi halinde karşı tarafın önceden verilmiş yazılı onayı üzerine mal verebilirler.

9.3.    Taraflar sözleşme süresince ve sözleşme sona erdikten sonra 1 yıl süre ile sınırlı olmaksızın birbirlerinin elemanlarını –kendileri veya başkası ile çalışmak üzere- diğer tarafla varolan sözlü veya yazılı anlaşmalarını feshetmeye veya herhangi başka türlü bir bağlantılarını kesmeye yönlendirmeyeceklerdir.

9.4.    Taraflar kendi çalışanlarının da bu gizlilik hükümleri ile bağlı olmasını ve bunlara uygun hareket etmesini sağlayacaklardır.

5

№ 21252

## 10. DİĞER HÜKÜMLER

10.1. BAYİ bu anlaşmadan doğan haklarını başkalarına devredemez. TBS'nin doğrudan veya dolaylı olarak kontrolünün el değiştirmesi halinde, TBS sözleşmenin yürürlükte kalmasını sağlamayı taahhüt eder.

10.2. Taraflar karşı tarafın sözleşme aykırı hareket etmesi halinde aykırılığın düzeltilmesi için yazılı olarak 15 gün süre tanıyacak, aykırılığın düzeltilmemesi halinde sözleşmeyi tek taraflı ve tazminatsız olarak feshedeceklerini bildirebilirler.

10.3. Sözleşme konusu ürünlerin uygulanmasından doğacak tüketici zararlarından BAYİ sorumludur.

## 11. SÖZLEŞMENİN SÜRESİ VE FESHİ

11.1. Sözleşmenin süresi, imzalandığı tarihten itibaren 1 (bir) yıldır.

11.2. Taraflar 11.1'de belirtilen 1 yıllık sürenin sonunda 1 ay önceden yazılı bildirimde bulunmak şartı ile Sözleşmeyi haklı sebep göstermeksizin tazminatsız olarak feshetme hakkına sahiptir. Sözleşme bu hüküm uyarınca feshedilmezse, kota miktarı haricinde aynı şartlarla kendiliğinden bir yıl daha uzar. Sözleşmenin alım hacmine ulaşılamamasına rağmen bu suretle uzaması halinde TBS'nin inisiyatifine bağlı olarak önceki seneden kalan bakiye kota bir sonraki senenin kotasına aktarılabilir. İzleyen sene için geçerli olacak kota miktarı taraflarca sözleşmenin süresinin bitiminden önceki 1 ay içinde kararlaştırılacak ve piyasa şartlarına göre makul olandan fazla bir artış ya da indirim yapılmayacaktır.

11.3. Akte aykırılık veya bu maddede öngörülen durumlar sonucunda sözleşme feshedilse veya sona erse dahi, TBS, BAYİ'nin fesih veya sona erme tarihinden önce önanlaşmaya vardığı müşterilerine ürünleri sağlamayı taahhüt eder.

## 12. FORCE MAJOR

12.1. Force major durumları tarafların savaş, deprem, sel, yangın, fırtına, ağır kâr yağışı, gibi ve diğer kontrolleri dışındaki akdi ifa etmelerini imkansız hale getiren durumlardır. Bu durumun gerçekleşmesi halinde taraflar bağlı oldukları ticaret odasının tasdik yazısı veya mahkeme kararı ile bu durumu makul süre içinde ve ilk fırsatta karşı tarafa kanıtlamalıdırlar.

6



### 13.  YETKİLİ MAHKEME

Sözleşmenin uygulanmasından doğacak ihtilafların hallinde İstanbul mahkemeleri ve İcra Daireleri yetkilidir.

### 14.  BİLDİRİMLER

Türk Ticaret Kanununda belirtilen özel durumlar haricinde bildirimler e-mail ve faks yoluyla yapılacaktır. Yukarıdaki adreslerde değişiklik olması halinde yeni adres karşı tarafa derhal bildirilecektir. Bildirim yapılmaması halinde sözleşmede belirtilen adreste ilgili tarafın bulunamaması halinde tebligat gerçekleşmiş sayılacaktır.

### 15.  HARCLAR

İşbu sözleşme dolayısı ile meydana gelebilecek her turlu resim harç ve sair yasal yükümlülükler Taraflarca eşit olarak ödenecektir.

Bu sözleşme    13 / 04 / 2010 tarihinde iki nüsha olarak imzalanmıştır.


**TBS**

TBS Group
Tradlng Busgges Solutlonü
Gayrettepe Barbaros Bulvarı
No:163 36 Beşiktaş - IST.
V.D. 157 045 7401
Sicilik No: 263 546 22470

**BAYİ**

SİNAN TÜKER        EMIRCAN GELIKKOL